J-A07035-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: L.V., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: J.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1390 EDA 2018 |

Appeal from the Dispositional Order April 16, 2018
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002253-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: L.V-H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: J.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1392 EDA 2018 |

Appeal from the Dispositional Order April 16, 2018
in the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0002269-2016

BEFORE:   LAZARUS, J., OLSON, J., and STEVENS, P.J.E.*

MEMORANDUM BY STEVENS, P.J.E.:                    **FILED APRIL 09, 2019**

Appellant, J.H. ("Mother"), files these consolidated appeals from the orders entered April 16, 2018 in the Philadelphia County Court of Common Pleas, adjudicating dependent her son, L.V., born in August 2016, and daughter, L.V.-H., born in January 2015 (collectively, the "Children"), as well

_____

* Former Justice specially assigned to the Superior Court.

as finding L.V. was abused, that aggravated circumstances exist, and that no efforts need to be made toward reunification. Mother also challenges the trial court's partial denial of Mother's motion for permission to take L.V. for medical examination (April 5, 2017), its denial of Mother's motion for reconsideration of that order (May 17, 2017), and its denial of Mother's motion for recusal (December 15, 2017). [1] After careful review, we affirm.

The trial court summarized the relevant factual history as follows:

**FINDINGS OF FACT**

On October 11, 2016, the Department of Human Services ("DHS") received a Child Protective Services ("CPS") report alleging that two (2) month old [c]hild[,] L.V. was admitted to the Children's Hospital of Philadelphia ("CHOP") on October 10, 2016 with multiple fractures. In total[,] twenty[-]six (26) fractures were eventually discovered. . . . Medical staff at CHOP determined that [] L.V.'s injuries were highly indicative of child abuse. These fractures were also in various stages of healing. CHOP admitted [] L.V. to the Trauma Unit where [] L.V. remained for several days. Mother and Father were unable to explain the causes of [] L.V.'s fractures. Mother and Father denied that the [c]hild had been dropped or fallen or left in the care of someone other than Mother or Father.

***

On October 13, 2016[,] [DHS] obtained an Order of Protective Custody for [] L.V. and [] L.V.H.[2]. . . On October 21, 2016, DHS filed the underlying Petition for Dependency and sought a finding of aggravated circumstances and child abuse against Mother and Father[.]

Trial Court Opinion ("T.C.O."), 10/5/18, at 4-5.

---

[1] The Children's father, J.A. ("Father") did not appeal any of these matters.
[2] The Children initially were placed in kinship care with Maternal Cousin, but were subsequently placed with Maternal Aunt on December 21, 2016. Notes of Testimony ("N.T."), 8/23/17, at 220-21; Continuance Order, 12/21/16.

On December 5, 2016, the CPS report stated that Mother and Father had been indicated as perpetrators of abuse based on medical evidence. N.T., 8/23/17, at 207-208. DHS investigative worker Ashley Wingate testified that the report was indicated based on "CHOP's findings that the injuries were extensive and indicative of inflicted injury. The parents couldn't offer any explanation for the injuries or how they occurred. Also, no one else was caretaker who could have caused the multiple injuries, including new and healing fractures." *Id.* at 219-20.

The trial court conducted adjudicatory hearings on August 23, 2017, September 11, 2017, December 15, 2017, March 27, 2018, and April 16, 2018. The Children were represented by Beth Kahn, Esquire, and Jalaine Stokes, Esquire, of the Defenders' Association Child Advocate Unit. Mother and Father were present and represented by counsel throughout.

Mother and Father testified on their own behalf as to the events that led to L.V.'s hospitalization on October 10, 2016. Mother noticed L.V.'s shoulder swelling on Thursday, October 6, 2016. Mother called the pediatrician on Friday, October 7, 2016 and was advised there were no doctors available to see L.V. While the doctor's office directed Mother to take L.V. to the emergency room, Mother decided to wait until L.V.'s scheduled pediatric appointment on Monday, October 10, 2016.

Mother testified that she felt the swelling in L.V.'s shoulder was not a serious injury as L.V. was not crying. That weekend, Mother felt L.V. was doing fine and sleeping well, but observed that he had reduced his level of feeding.

On Monday, before taking L.V. to his appointment, Mother noticed swelling in L.V.'s leg, but asserted that she never saw any bruises. At this visit, L.V.'s pediatrician directed Mother to take L.V. to the emergency room, where CHOP personnel discovered that L.V. had twenty-six fractures.[3]

Mother claimed she had no reason to believe Father harmed L.V.; she indicated she always was with the baby as she was on maternity leave and L.V. was left alone with Father "maybe three, five times." N.T., 3/27/18, at 153. After the Children were removed from her home, Mother admitted that she and Father could not "handle … the fact that our kids were taken away," and shared that Parents' marriage experienced a lot of conflict. *Id*. at 159. Mother conceded that she filed for a Protection from Abuse (PFA) order against Father, claiming he threatened to slice her throat. *Id*. at 159. However, Mother testified that she had no reason to believe Father injured L.V.

Father gave similar testimony describing the days before L.V.'s injuries were discovered in the CHOP emergency room. Father admitted seeing L.V.'s shoulder was swollen on Thursday, October 6, 2016, but corroborated Mother's testimony that the pediatrician was not available until the following Monday morning. Father claimed that he did not see that L.V.'s leg was swollen as the baby always had clothes on; Father shared that both Mother

---

[3] Notably, Mother indicated she had taken L.V. to the emergency room at St. Christopher's Hospital two weeks earlier on September 16, 2016, at the direction of the pediatrician, due to discoloration in L.V.'s nails, his vomiting of formula and breast milk, and a "lump" on his back. However, emergency room personnel sent Mother home without a diagnosis. *Id.* at 146-47.

and Father cared for him. Father indicated that "at no time whatsoever" would Mother have caused L.V.'s injuries. N.T., 3/27/18, at 180. When asked about Mother's claim that he threatened to slice her throat, Father asserted that he did not use those words. *Id*. at 181.

The parties offered competing medical expert testimony to attempt to explain the cause of L.V.'s injuries. DHS first presented the testimony of Dr. Cindy Christian, a CHOP pediatrician on the Suspected Child Abuse and Neglect ("SCAN") team or child protection team, whom the trial court qualified as an expert in pediatrics and pediatric child abuse. Dr. Christian reported L.V. presented at the CHOP emergency room in a lot of pain and was not moving his left leg. L.V. was admitted to the Trauma Service as he exhibited twenty-six fractures and had to be treated gently. N.T., 8/23/17, at 66. L.V. had both new and healing fractures of his ribs, metatarsal (foot), tibia (shin bone), femur (thigh bone), humerus (arm), and acromion (shoulder blade). *Id.* at 49-50, 54-59, 66. Dr. Christian stated,

> Many of the fractures that we saw were fractures that are more specific or not seen very frequently in children who have accidental fractures; more commonly seen in children who have inflicted fractures.
> And I think what was remarkable about [L.V.] was how many fractures he had when he came into the hospital.

*Id.* at 64. She noted that shoulder blade and rib fractures are uncommon in accidental trauma. She noted L.V. had some metaphyseal fractures located at "the end or the growing portion of the bone," which were uncommon. *Id.*

at 55, 65. Moreover, Dr. Christian reiterated that she never saw the amount of fractures exhibited instantly as a result of accidental trauma. *Id.* at 66.

Due to the high number of fractures, Dr. Christian found it necessary to rule out any underlying disease processes and obtained a consult for metabolic bone disease. *Id.* at 70-71. After further testing, Dr. Christian was able to rule out osteogenesis imperfecta (brittle bone disease), vitamin D deficiency, and rickets disease.[4] *Id.* at 71-75; *see also* DHS Exhibit 6. When asked to evaluate the opinion of Mother's expert, Dr. Michael Holick, who believes L.V. has a metabolic bone disease called Ehlers-Danlos syndrome, Dr. Christian asserted that Ehlers-Danlos syndrome is "not a disease that's known to cause multiple fractures in infants, and not a disease that's associated with fractures in infants." N.T., 8/23/17, at 85.

---

[4] With respect to rickets, Dr. Christian explained that,

> Rickets is a metabolic disorder of growing bones where, because -- most commonly -- there are multiple causes of rickets, but the most common is vitamin D deficiency.
>
> You need good vitamin D to mineralize your growing bones. And if you don't have enough vitamin D, then you can't lay down the normal calcium and phosphorus at the ends of your growing bones.

N.T., 8/23/17, at 76-77. In addition, Dr. Christian reported that L.V.'s vitamin D level was "insufficient, but sufficient for bone health." A level is deemed "deficient" if below 20; L.V.'s level was 23. *Id.* at 74. A course of vitamin D supplementation was recommended and instituted. *See* DHS Exhibit 4.

Moreover, after Dr. Christian observed abnormal healing of L.V.'s bones on a second skeletal survey, she obtained a third survey, which revealed no new fractures and normal healing of existing fractures.[5] She explained,

> At the time of [L.V.'s] follow-up skeletal survey, which was two or three weeks after he was hospitalized, when we reviewed the x-rays and he had some unusual kind of findings on -- as his bones were healing, in addition to doing genetic testing, I thought that it might be useful to get yet a third set of skeletal survey because -- which I don't normally do.
>
> We always would get a skeletal survey when babies are initially hospitalized. We often get a follow-up a few weeks after hospitalization.
>
> But I thought – I knew that [L.V.] was in a different home environment and that, if I waited a few more weeks and got yet a third skeletal survey and I saw additional new fractures that I hadn't been seeing on the first two skeletal surveys, it would indicate to me that there was something inherently wrong with his bones that maybe we were missing with our osteogenesis imperfecta studies.
>
> I don't know what that was, but I felt like it was -- it would tell me that there were -- that there was more testing that we should think about or -- or do.
>
> And, so, I asked for [L.V.] to have a third skeletal survey. And, again, Your Honor, I don't normally do this. And he did have the third skeletal survey, and there were no new fractures.
>
> So -- and all of the other fractures that he already had were healing very nicely. And, so, at that time, I didn't think that additional testing for genetic diseases was indicated at that time because, as soon as he came into the hospital, he had no further fractures.
>
> And in the first two months of life, he had multiple, multiple fractures. So, if he had a genetic disease that was so terrible that it broke multiple bones in the first two months of life, it didn't seem consistent with then it suddenly -- there were no more fractures after that.

---

[5] Three skeletal surveys were obtained on October 11, 2016, October 28, 2016, and on November 17, 2016. N.T., 8/23/17, at 81; DHS Exhibit 5.

*Id.* at 79-80. She found that the fact that L.V.'s "third skeletal survey [] didn't show ongoing fragility of his bones suggested that he didn't have a genetic disease that caused all of the fractures that we saw in the first -- at two months of age." *Id.* at 98. As such, Dr. Christian testified to a reasonable degree of medical certainty that L.V.'s injuries were "highly concerning for inflicted or non-accidental trauma." *Id.* at 100.

DHS also offered the testimony of Dr. Maria Katherine Henry, a fellow physician on the child protection team at CHOP, who was qualified without objection as an expert in pediatrics and child abuse. Dr. Henry concurred that L.V.'s injuries were "highly concerning for inflicted trauma." N.T., 8/23/17, at 194. When asked for the basis for this determination, Dr. Henry stated,

> So, we based that on the absence of a history of trauma provided. In addition, we did a medical evaluation, looking at nutritional bone disease, and did not find significant diseases in his vitamin D level.
> We, in addition, consulted our colleagues in metabolism, who sent different testing for osteogenesis imperfecta, and that was negative, as well.
> So, it was the absence of a history of any type of accidental trauma that could explain these findings, and then, in addition, an absence of a medical cause that was identified to explain his injuries.

*Id.* When asked if L.V.'s injuries caused concern, Dr. Henry explained,

> So -- yes. We look at the constellation of injuries, and that's concerning. And, so, as a whole, his injuries were concerning, but there were some injuries in isolation that would be concerning for inflicted trauma.
> And those include the rib fractures, the fractured scapula, as well his foot fractures. So, he did have injuries in isolation, but it was also the constellation of injuries that was concerning.

*Id.* at 194-95.

Moreover, DHS presented the testimony of Ashley Wingate, DHS investigative worker, and Patrice Stewart-Lane, CUA case manager, Catholic Community Services. Ms. Stewart-Lane testified that she was troubled that there was no explanation for L.V.'s fractures, and that the family needed services due to issues of domestic abuse. N.T., 8/23/17, at 233. She expressed that the Children should remain in the kinship home. *Id.*

Mother presented the testimony of Dr. Michael Holick, a practicing endocrinologist who specializes in the area of metabolic bone disease with research focused on vitamin D deficiency. Although Mother offered Dr. Holick as an expert in endocrinology and pediatric endocrinology, the trial court only qualified Dr. Holick as an expert in the treatment of vitamin D deficiency. [6]

Dr. Holick testified that L.V. had a "high likelihood" of having Ehlers-Danlos hypermobility type 3 syndrome, a disorder of the collagen matrix related to osteogenesis imperfecta and marfan syndrome. N.T., 8/23/17, at 284. He further noted that, due to vitamin D insufficiency, L.V. was at increased risk for bone fragility. *Id.* at 285-86. Dr. Holick opined that this combination "markedly increases the fragility of [the collagen matrix], increasing risk for fracture with normal handling." *Id.* at 303-304.

---

[6] Dr. Holick's report, dated March 15, 2017, was admitted as Mother's Exhibit 6. N.T., 8/23/17, at 310-11. He testified on voir dire that "endocrinology is the study of hormones, and vitamin D is a hormone. . . .And also, … many of the hormones are related to metabolic bone disease. . . .And, so, typically, patients with metabolic bone disease will see an endocrinologist." *Id.* at 263.

Although Dr. Holick admitted that he did not examine L.V., he noted symptoms of Ehlers-Danlos syndrome from L.V.'s medical records, such as gastroparesis, mast cell hypersensitivity, and blue sclera (whites of the eyes).[7] *Id.* at 277. Dr. Holick indicated that Mother was vitamin D deficient and, as Mother breastfed L.V., "he was likely vitamin D deficient at the time of his birth, and at least during the first month, when he was being breastfed, since there is essentially no vitamin D in breast milk." *Id.* at 285.

Moreover, Dr. Holick felt L.V. was likely to have Ehlers-Danlos syndrome based on the fact that he diagnosed Mother with Ehlers-Danlos syndrome with marfanoid features after clinical examination. *Id.* at 269, 274-75, 287.[8] Given that Ehlers-Danlos syndrome is a genetic disorder that is autosomal dominant, Dr. Holick believed L.V. had a fifty percent chance of acquiring it from Mother. *Id.* at 268, 275, 284. As to his diagnosis that L.V. has Ehlers-Danlos syndrome, Dr. Holick stated, "I can't say that it explains 26 fractures,

---

[7] Dr. Holick testified that some pediatricians have not fully understood or appreciated the variety of symptoms associated with Ehlers-Danlos syndrome in infants, such as difficulty having full meals, gastroparesis, muddled-looking skin, which is a sign for mast cell hypersensitivity. Dr. Holick claimed that it is "well-documented in the literature by many publications that Ehlers-Danlos syndrome is associated with fragility fractures of the skeleton." *Id.* at 273.

[8] Dr. Holick indicated that Ehlers-Danlos syndrome, while a genetic syndrome, is diagnosed clinically with a nine-point Beighton score analysis that examines the flexibility of various joints. A score of five out of nine would be diagnostic for Ehlers-Danlos syndrome; Dr. Holick found Mother had a Beighton score of seven out of nine. *Id*. at 269-71, 278-79.

However, Dr. Holick acknowledged that, as a Beighton score cannot be assessed on infants, a diagnosis of Ehlers-Danlos syndrome cannot be made with "a high degree of medical certainty" in infants. *Id*. at 299-300, 307-308.

but what I can say is that it can certainly explain many of the fractures, because it's associated with bone fragility in children and adults." *Id.* at 288.

Mother also presented the testimony of Dr. Julie Mack, a physician certified in both radiology and pediatric radiology. Despite noting that Dr. Mack had not focused in pediatric radiology for an extended period of time, the trial court qualified Dr. Mack as an expert in pediatric radiology.[9]

Dr. Mack testified to an abnormality with L.V.'s case upon review of radiologic imaging. N.T., 3/27/18, at 42. She observed that, "the imaging was so unusual. This was not a case of standard fracture with typical healing of fractures. . . . There's something odd about these bones. . . . A lot of my report is recommendation for more information, because I considered the findings unusual." *Id*. Thus, Dr. Mack expressed the need for further consideration and investigation as to underlying metabolic and/or genetic disease process. *Id*. at 42, 47, 69, 82.

> I think … my conclusion in this case is that there are many things in this case that do not -- should not be brushed aside as irrelevant or unimportant, because they are standing out like big white light bulbs, saying this is -- something's unusual here and this child deserves a consideration that these things actually contributed to weak bones in this case. . . .

---

[9] Dr. Mack's report, dated March 15, 2017, was admitted as Mother's Exhibit 4. N.T., 3/27/18, at 81. Dr. Mack admitted that she has focused on breast imaging since 2006, except for when on-call until 2011 and conducting private consulting work. In qualifying Dr. Mack as an expert in pediatric radiology, the trial court stated, "All right. I'm going to find the doctor's an expert in pediatric radiology, with this caveat, that her – and I'm going to give her testimony the weight it deserves. However, keeping in mind that she has really not practiced in this field since 2006. . . ." *Id.* at 38.

*Id.* at 94. Dr. Mack further opined in her report,

> [w]hile unexplained fractures raise the suspicion of possible abuse, the radiologic findings seen in [L.V.] also raise a significant concern that the best explanation for these unexplained fractures and bone abnormalities is a bone fragility disorder that remains undiagnosed. A work up by a clinician or geneticist with expertise in bone fragility syndromes, preferably with an emphasis on structural proteins, to ascertain whether additional imaging and/or testing, such as whole exome sequencing, is warranted is recommended. . . .

Mother's Exhibit 4, at 18. However, while noting that features on the imaging supported a diagnosis of rickets or a collagen disorder, Dr. Mack clarified that Ehlers-Danlos syndrome requires a clinical diagnosis, not a radiographic one. As such, Dr. Mack could not say whether L.V.'s injuries were due to an underlying genetic disorder and could not rule out that L.V.'s injuries were caused by abuse. N.T., 3/27/18, at 94-95, 102.

The Child Advocate presented, by way of rebuttal to the testimony of Mother's experts, respectively, the testimony of Dr. Sabah Servaes, a pediatric radiologist at CHOP, who was also qualified as an expert in pediatric radiology. Dr. Servaes questioned Dr. Mack's conclusions:

> **Q.** Okay. Can you tell the [c]ourt whether you -- what your -- whether you're in agreement with what Dr. Mack has testified here today?
> **A.** Largely, no. Much of her commentary, some of her statements are accurate and true, but her overall summary, I disagree with.
> **Q.** Okay. Can you explain that in any further detail though?
> **A.** Yes. So she has suggested that there may be some underlying metabolic bone disease. That seems to be her primary concern. And with metabolic bone disease, that's a systemic disorder, that we see it in multiple bones, that we don't just see it in a single bone or a single area of the body. And it is true that, for example, rickets, one of the named disorders that she listed, you might see

it earlier in part of the skeleton than another -- than in other parts. However, it will be symmetric. You'll see it on both sides. . . .

N.T., 3/27/18, at 115-16.

In her professional opinion, Dr. Servaes testified that she did not believe that L.V. has any kind of metabolic bone disorder. *Id.* at 124. She provided that "the findings that we see in his case are very asymmetric. There is no underlying systemic disorder that I can see on the images and it is typical when there is metabolic bone disease that severe enough to result in fractures that you can see the abnormality in the bones." *Id.*

Rather, Dr. Servaes opined that L.V. was the victim of non-accidental trauma. *Id.* at 128-29. When asked to explain, she responded, "There are multiple fractures -- there are multiple fractures in different stages of healing. They're in characteristic locations, being at the ribs and at the ends of long bones like the femur, the tibia, the humerus. And there isn't any apparent underlying disorder that I can see." *Id.* at 129.

The Child Advocate also presented Dr. Paige Kaplan, a physician formerly associated with CHOP, who was qualified as an expert in pediatric genetics. Dr. Kaplan testified that she was present at the September 1, 2017 examination of L.V. (who was then one year old). Dr. Kaplan stated,

> I observed that there were no features of Ehlers-Danlos syndrome in [L.V.] He did not have any joint hypermobility. He walked very well, independently, with a very steady gait for a child of one year and three weeks.
>     The whites of his eyes, the sclera, were only slightly gray, which is common in this age group. . . .
> ***
> He did not have stretchy skin. He did not have any bruises. And, in the history, his aunt reported no features that were suggestive

of Ehlers-Danlos syndrome, such as frequent falls, bruising, constipation, changes in color of his skin.

Additionally, he'd been reported to have dark brown discoloration and pitting of his nails from birth, and I had seen photographs of those. And, by the time he was evaluated at a year and three weeks, this had cleared up.

N.T. 4/16/18, at 12-13. She continued,

In my observation of his exam that day, and in view of the fact that he'd had extensive testing using the most modern molecular methods for osteogenesis imperfecta -- brittle bone disease -- and his chemical value, there was no evidence for him having Ehlers-Danlos syndrome or osteogenesis imperfecta and it was not warranted to do any other testing.

*Id.* at 14.

As such, Dr. Kaplan disagreed with Dr. Holick's conclusion that L.V. had Ehlers-Danlos syndrome. *Id.* at 14-15. Aside from a lack of evidence, she explained that it is "not compatible with Ehlers-Danlos syndrome to have fractures in a one or two or three month old baby. This is not part of the Ehlers-Danlos syndrome." *Id.* at 15-16. She also disagreed with Dr. Holick's conclusion that a vitamin D deficiency made L.V. susceptible to fracture, noting, "a recent article by another consortium of vitamin D experts from around the world concluded that low vitamin D was not the reason for people having multiple fractures, *per se*." *Id.* at 16-17. Further, while vitamin D deficiency can result in rickets, which can be linked with fractures, Dr. Kaplan indicated that this usually occurs with weight-bearing fractures, which would not occur in a two-month old baby. *Id.* at 17.

Moreover, Dr. Kaplan reiterated that genetic testing was conducted and revealed that L.V. did not have osteogenesis imperfecta. *Id.* at 18, 20. As

such, when asked if there was evidence of an underlying genetic disorder for L.V.'s injuries, Dr. Kaplan responded, "There was no evidence for [L.V.] having a condition that would lead to multiple fractures[,] such as osteogenesis imperfecta[,] in this two to three month-old baby." ***Id.*** at 20-21.

At the conclusion of the hearing on April 16, 2018, the lower court adjudicated the Children dependent, and found aggravated circumstances existed such that reasonable efforts were not required by CYS to reunify Child with Mother or Father. The court stated,

> Based on the testimony of Dr. Christian, Dr. Henry, Dr. [Servaes] and Dr. Kaplan, today, I'm making the following findings: That there are no symptoms in this child of genetic disorder, there are no Ehlers-Danlos syndrome [sic], there's no brittle bone disease, and there's no evidence of [R]ickets in this child.
> What there is evidence of is child abuse -- 26 fractures. And the testimony of the experts, the pediatric experts and the genetic experts, the child abuse experts -- none of which was presented by the parents' attorney.
> Dr. Holick was qualified as a vitamin D expert. I had trouble with his testimony. It did not appear to be credible to me.
> I did find the testimony of the doctors[] presented by the City and by the child advocate[] to be credible, along with the CUA case manager, Ms. … Stewart-Lane, and also the DHS investigator, Ms. Wingate. I found the divergent testimony of the parents, pointing fingers at each other, to be incredible.[10]
> And therefore, I am adjudicating the child dependent based on present inability. I'm making a finding of child abuse under Title 23, and also making a finding of aggravated circumstances as to both parents under Title 42, Section 6202(2).

---

[10] Mother and Father's testimony does not suggest that they were "pointing fingers at each other." Mother claimed she had no reason to believe L.V. was harmed by Father. N.T., 3/27/18, at 154, 160. Further, Father testified he did not believe it was possible that Mother harmed L.V. ***Id.*** at 180.

I am ordering no reasonable efforts to reunite this child, based upon the severity of the injuries to this child, and based upon all of the testimony, the totality of which -- I've reached the inescapable conclusion that this child has been abused and that the parents were the ones who had custody of this child while the abuse occurred.

N.T., 4/16/18, at 76-77. Upon clarification, the court indicated that it was also adjudicating L.V.-H. dependent, and making a finding of aggravated circumstances and that no reasonable efforts for reunification were necessary. *Id*. at 77-78. However, the trial court allowed Mother and Father to have continued visitation. These findings were memorialized by orders entered April 16, 2018. The court entered separate orders of adjudication and disposition and aggravated circumstances orders for each child.

On May 11, 2018, Mother filed a timely notice of appeal, along with concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b). On May 23, 2018, this Court consolidated Mother's appeals pursuant to Pa.R.A.P. 513.

On appeal, Mother raises the following issues for our review:

1. Did the trial court err when it denied Mother the opportunity to take her son, L.V., outside of Philadelphia to be examined by a Massachusetts [e]ndocrinologist (Dr. Michael Holick) and Ohio pediatric geneticist (Dr. Marvin Miller)?

2. Did the trial court err when it failed to credit Dr. Holick's testimony because he had not examined L.V., failed to credit Dr. Holick because he was not a child abuse doctor, failed to qualify Dr. Holick as an expert in endocrinology and pediatric endocrinology, and criticized Mother for failing to procure a geneticist?

3. Did the trial court err when it failed to recuse itself for having a bias in favor of child abuse and CHOP doctors?

4. Did the trial court err when it ordered that DHS make no efforts to reunify the children with their Mother?

5. Did the trial court err by extreme delay in scheduling the dependency hearing?

6. Did the trial court err when it ordered that DHS make no efforts to reunify the children with their Mother?

7. Did the trial court err when it linked reunification with one or both of the parents' confessing to abusing L.V.?

Mother's Brief at 2-3. [11]

Our standard of review for dependency cases is as follows:

[T]he standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record, but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re R.J.T.*, 608 Pa. 9, 26-27, 9 A.3d 1179, 1190 (2010) (citations omitted).

The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted).

_____

[11] Upon review of Mother's Rule 1925(b) statement and the argument section of her brief, it appears that Mother made an error and repeated her sixth issue in her statement of questions presented. From her Rule 1925(b) statement and argument, we recognize that her fourth issue is, "The trial court erred when it found the children dependent, when it found [L.V.] had been abused and erred in finding aggravated circumstances." Concise Statement of Matters Complained of on Appeal, 5/11/18. As we are able to discern the issue, as were the trial court and other parties, we do not penalize Mother.

However, prior to reaching the merits of Mother's arguments, we must first address we have jurisdiction over the appeal. "This [C]ourt may examine appealability *sua sponte* because it affects our jurisdiction over the matter." ***In re K.K.***, 957 A.2d 298, 303 (Pa.Super. 2008) (citation omitted).

First, we observe Mother filed only one notice of appeal on May 11, 2018 from the separate orders as to each child entered on the separate dockets. Our Supreme Court has held that "where a single order resolves issues arising on more than one docket, separate notices of appeal must be filed for each case." ***Commonwealth v. Walker***, ___Pa.___, 185 A.3d 969, 971 (2018).

However, the Court in ***Walker*** declined to apply the rule to the case before it, because to do so would run "contrary to decades of case law from [the Pennsylvania Supreme Court] and the intermediate appellate courts that, while disapproving of the practice of failing to file multiple appeals, seldom quashed appeals as a result." ***Id.*** Thus, the Supreme Court instructed that in all *future* cases, a failure to file a notice of appeal for each lower court docket will result in quashal of the appeal. As Mother's notice of appeal was filed prior to the ***Walker*** ruling, ***Walker*** is not controlling in this case. Thus, we decline to quash Mother's appeal on this basis.

Next, we must determine whether we have jurisdiction as to review the trial court's previous orders denying Mother's request to take L.V. out-of-state for medical examination, and its denial of Mother's motion for recusal. The trial court did not address the merits of these claims, which it deemed untimely as Mother did not file appeals within thirty days of the entry of these orders.

*See* Pa.R.A.P. 903 (providing that a notice of appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken").

However, it is well-settled that, "[a]n appeal lies only from a final order, unless permitted by rule or statute." *Stewart v. Foxworth*, 65 A.3d 468, 471 (Pa.Super. 2013). Generally, a final order is one that disposes of all claims and all parties. *See* Pa.R.A.P. 341(b). *See also In re H.S.W.C.-B & S.E.C.-B.*, 575 Pa. 473, 478, 836 A.2d 908, 911 (2003) (finding, with regard to dependency matters, "[a]n order granting or denying a status change, as well as an order terminating or preserving parental rights, shall be deemed final when entered") (citation omitted).

Upon review, we conclude that the April 5, 2017 and May 17, 2017 orders as to permission to take L.V. for additional medical examination, and the December 15, 2017 order as to recusal were not final, appealable orders. As these orders did not dispose of a goal change and/or termination petition, the within appeal challenging those matters is timely.

Moreover, DHS and the Child Advocate argue that the majority of Mother's claims should be deemed waived as they are undeveloped without pertinent citation to legal authority. *See In re W.H.*, 25 A.3d 330, 339 n.3 (Pa.Super. 2011), *appeal denied*, 611 Pa. 643, 24 A.3d 364 (2011) (quoting *In re A.C.*, 991 A.2d 884, 897 (Pa.Super. 2010)) ("[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived"); *see also In re M.Z.T.M.W.*, 163 A.3d 462, 465-66

(Pa.Super. 2017). Although Mother's brief is deficient in some instances, Mother provides some citation to legal authority and does not prevent meaningful review. Thus, we decline to find waiver.

Turning to the merits of Mother's appeal, Mother first claims that the trial court erred when it denied her the opportunity to take L.V. for examination by Dr. Holick (an endocrinologist in Massachusetts) and Dr. Miller (a pediatric geneticist in Ohio). Mother's Brief at 10. Mother argues,

> [t]he right to obtain expert witness evidence in a medically complex case is mandated by the due process clause of the United States Constitution. The Pennsylvania Supreme Court has recognized a parent's right to have relevant expert witness testimony admitted at a dependency hearing, reversing the trial court's decision to exclude such evidence. [**In re C.M.T.**], 861 A.2d 348, (Pa. 2004). The trial court's refusal to allow Mother to take (or send) L.V. outside of Philadelphia to obtain second opinions to counter the opinions of the four CHOP doctors called by DHS and the CA [Child Advocate], effectively denied Mother the ability to adequately defend the medically diagnosed allegations of child abuse in the dependency petition.

*Id.* at 10-11. While Mother acknowledges the lower court permitted further examination of L.V. in Philadelphia, she claims this restriction is unfair as neither of her desired experts is licensed in Pennsylvania, Pennsylvania does not allow telemedicine, and Pennsylvania's temporary license requirements are burdensome. *Id.* at 13-14.

Section 6339 of the Juvenile Act provides in pertinent part:

> **(b) Physical and mental examinations and treatment.--**
> During the pendency of any proceeding the court may order the child to be examined at a suitable place by a physician or psychologist and may also order medical or surgical treatment of a child who is suffering from a serious physical condition or illness

which in the opinion of a licensed physician requires prompt treatment, even if the parent, guardian, or other custodian has not been given notice of a hearing, is not available, or without good cause informs the court of his refusal to consent to the treatment.

42 Pa.C.S.A. § 6339(b).

In this case, the trial court granted Mother's motion to seek additional medical examination from the physicians of her choice, but required that such examinations be conducted in Philadelphia. The trial court provided:

> **THE COURT:** So, I'm granting your motion as to allowing an examination of the child. I need the names of which doctors you wish the child to be examined by. This examination will take place in Philadelphia. Your expert doctors are to make arrangements with the appropriate hospital or doctor to conduct these examinations.
>
> [] how old is the child now, seven months old?
>
> **[Counsel for DHS]:** Eight months, Your Honor.
>
> **THE COURT:** Eight months old. I'm not having an eight-month-old dragged throughout the country. I mean[,] if your expert was in China[,] I wouldn't grant the motion either.
> ***
> I'm just changing the venue of where these exams will take place. The most logical place is where the child is in placement in Philadelphia. This [c]ourt has jurisdiction. And the injuries allegedly occurred in Philadelphia. The expert doctors at CHOP are in Philadelphia. I'm not denying your motion[,] I'm just granting your motion and telling you that you are to make arrangements for the doctors to examine the child. You put in your motion[,] I think I read[,] this examination would only take an hour or two. Have the doctor fly down on his clinical day for an hour or two from Boston. It's a one hour flight. He'll be back in two hours or three hours after he examines the child, and he can write up his report.

N.T., 4/5/17, at 23-24.

In denying Mother's motion for reconsideration, the court explained:

> **THE COURT:** I'm not precluding you from having this doctor examine this child. My ruling was the child's not going to be moved out of state to accommodate your client's interest. It's not in the best interest of a child who is severely injured to be moved and examined by a doctor who I don't even know is qualified to examine the child.

N.T., 5/17/17, at 12.

The trial court appropriately exercised its discretion in determining that the only suitable place for L.V. to be examined was Philadelphia, as it would not be in L.V.'s best interests to move him long distances due to his recent recovery from twenty-six fractures and the possibility that L.V.'s bones were fragile due to a metabolic and/or genetic condition.

Mother baldly asserts that it was too burdensome for her experts to obtain temporary licensing to examine L.V. in Pennsylvania. However, it appears that she did not fully investigate this course of action as her own expert, Dr. Holick, was unaware such licensing was available. Moreover, Pennsylvania regulatory law allows for the temporary licensure of an appropriately licensed physician who is licensed in "another state, territory, or possession of the United States" for numerous circumstances, including the physician's "participation in a medical or surgical procedure necessary for the well-being of a specified patient." 49 Pa.Code § 17.6(a)(2). The Board of Medicine also has the discretion to issue a temporary license to a physician for a purpose as deemed appropriate on a case by case basis. 49 Pa.Code § 17.6(i). As such, this claim is meritless.

Second, Mother asserts that the trial court should have qualified Dr. Holick as an expert in endocrinology and given Dr. Holick's testimony more weight. To the extent Mother opposes the court's failure to qualify Dr. Holick as an endocrinologist or pediatric endocrinologist, we find that Mother failed to preserve such a challenge as she did not specifically include this issue in her Rule 1925(b) statement. *See Krebs v. United Refining Co. of Pennsylvania*, 893 A.2d 776, 797 (Pa.Super. 2006) (stating that a failure to preserve issues by raising them both in the concise statement of errors complained of on appeal and statement of questions involved portion of the brief on appeal results in a waiver of those issues); *see also In re M.Z.T.M.W.*, 163 A.3d at 466 (same). As such, this portion of Mother's second issue raised would be waived.

Nevertheless, regardless of waiver, we find the entire issue to be without merit. As to expert witnesses and qualification, this Court has stated,

> "Whether a witness has been properly qualified to give expert witness testimony is vested in the discretion of the trial court." *Kovalev v. Sowell*, 839 A.2d 359, 362–363 (Pa.Super. 2003) (citation omitted). "It is well settled in Pennsylvania that the standard for qualification of an expert witness is a liberal one. When determining whether a witness is qualified as an expert the court is to examine whether the witness has any reasonable pretension to specialized knowledge on the subject under investigation." *Id.* (citations omitted).

> The determination of whether a witness is a qualified expert involves two inquiries: When a witness is offered as an expert, the first question the trial court should ask is whether the subject on which the witness will express an opinion is so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman.... If the subject is of this

- 23 -

sort, the next question the court should ask is whether the witness has sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth. **Sowell**, 839 A.2d at 363 (citations and quotation marks omitted).

**Seels v. Tenet Health Sys. Hahnemann, LLC**, 167 A.3d 190, 200–201 (Pa.Super. 2017); **see also** Pa.R.E. 702. Further, "the weight to be given to such testimony is for the trier of fact to determine." **Miller v. Brass Rail Tavern, Inc.**, 541 Pa. 474, 480-81, 664 A.2d 525, 528 (1995).

Upon review, the record supports the trial court's qualification of Dr. Holick as an expert in vitamin D deficiency and treatment. Dr. Holick testified that, while he practiced in the field of endocrinology, which is the study of hormones, he focused his research on vitamin D deficiency. N.T., 8/23/17, at 240, 263. He confirmed that he is neither a pediatrician nor child abuse expert nor geneticist. **Id.** at 261-62, 265.

Moreover, the trial court "had trouble" finding Dr. Holick's testimony to be credible as Dr. Holick admitted he diagnosed L.V. with Ehlers-Danlos syndrome without ever physically examining L.V. Rather, Dr. Holick inferred that L.V. had this condition by reviewing L.V.'s medical records and examining Mother. **Id.** at 266. The trial court chose to give more weight to DHS's experts who argued that L.V.'s numerous fractures were indicative of child abuse as there was no signs that L.V. suffered from metabolic bone disease.

As noted above, we are required to defer to a trial court's credibility findings if they are supported by the evidence. **In re R.J.T.**, **supra**. The trial court was free to resolve conflicts in the competing medical expert testimony

and find DHS's experts to be more credible than Mother's experts. *See In re M.G. & J.G.*, *supra*. As the trial court's findings are supported by the record, the trial court was within its discretion to give Dr. Holick's testimony the weight and credibility it deemed appropriate.

Third, Mother asserts that the trial court should have recused itself due to its fixed belief that child abuse had occurred and in showing bias for CHOP doctors over physicians who were not from Philadelphia. Moreover, Mother asserts that the trial court exhibited hostility towards her expert, Dr. Holick. Mother asserts, "[t]he trial court made a series of comments on the record that would lead a reasonable person to question the trial court's ability to be fair and impartial when hearing child abuse and CHOP doctor testimony." Mother's Brief at 29.

The denial of a motion to recuse is preserved as an assignment of error that can be raised on appeal following the conclusion of the case. *Reilly by Reilly v. Southeastern Pennsylvania Transp. Authority*, 507 Pa. 204, 222, 489 A.2d 1291, 1300 (1985), *overruled on other grounds as recognized by Gallagher v. Harleysville Mut.*, 617 A.2d 790, 794 (Pa.Super. 1992). We review a trial court's decision to deny a motion to recuse for an abuse of discretion. *Vargo v. Schwartz*, 940 A.2d 459, 471 (Pa.Super. 2007).

Indeed, our review of a trial court's denial of a motion to recuse is exceptionally deferential. *Id*. ("[W]e extend extreme deference to a trial court's decision not to recuse"). "We recognize that our trial judges are 'honorable, fair and competent,' and although we employ an abuse of

discretion standard, we do so recognizing that the judge himself is best qualified to gauge his ability to preside impartially." **Commonwealth v. Harris**, 979 A.2d 387, 391-92 (Pa.Super. 2009) (citation omitted). A trial judge should grant the motion to recuse only if a doubt exists as to his or her ability to preside impartially or if impartiality can be reasonably questioned. **In re Bridgeport Fire Litigation**, 5 A.3d 1250, 1254 (Pa.Super. 2010).

In order to prevail on a motion for recusal, the party seeking recusal is required "to produce evidence establishing bias, prejudice or unfairness which raises a substantial doubt as to the jurist's ability to preside impartially." **In re S.H.**, 879 A.2d 802, 808 (Pa.Super. 2005) (citation omitted). Critically, Code of Judicial Conduct Rule 2.2 (Impartiality and Fairness) provides that "[a] judge shall uphold and apply the law, and shall perform all duties of judicial office fairly and impartially."

In the case *sub judice*, we discern no abuse of discretion. Although the court expressed confidence in the qualifications and opinions of the CHOP physicians offered by DHS and questioned Dr. Holick's credibility, the trial court's statements do not evidence bias. Rather, the trial judge's reluctance to credit Dr. Holick's opinion was based on his skepticism of Dr. Holick's diagnosis of L.V. with a metabolic bone disease given that (1) Dr. Holick had not examined the child and (2) doctors that had examined L.V. found no indication of metabolic bone disease.

Although the trial court at several points did make seemingly inappropriate criticisms of Dr. Holick's credentials, past achievements, and

publications, "we are nevertheless mindful of the fact that judges, too, are subject to human emotion." *Commonwealth v. Abu-Jamal*, 553 Pa. 485, 507–508, 720 A.2d 79, 89–90 (1998) (finding trial court's hostile and intemperate remarks did not evidence a settled bias). We recognize that the trial court was dealing with a difficult and emotionally-charged matter where a two-month-old child suffered twenty-six fractures without explanation.

Moreover, while Mother highlights statements of the trial court that she finds objectionable, Mother ignores the trial court's statements in support of her position and completely contrary to any assertion of bias. Notably, the court stated,

> [Mother and Father] are raising very legitimate claims . . . that these injuries may have in fact occurred as a result of genetic predisposition that the child suffers from. And I don't think your contradictions – I don't know if you're going to present any evidence that [M]other doesn't have this condition or not. If she has the condition and the child is fifty percent predisposed as counsel argues of having this condition, it weighs heavily with regard to any ruling this [c]ourt has on child abuse.

N.T., 4/5/17, at 26. As such, we cannot find the trial judge abused his discretion in ruling that he would be able to preside over the case fairly and impartially.

In Mother's fourth and sixth issues, she claims the trial court erred in its findings relevant to dependency, abuse, and aggravated circumstances, which suspended the need for DHS to make efforts toward reunification. We address these claims together, as Mother intermingles these issues in her discussion. Mother also claims DHS failed to establish her lack of parental capacity:

Mother maintains that she never saw Father abuse L.V., and never noticed any bruising or indications of abuse after L.V. was alone with Father. However, during the pendency of this dependency proceeding, Mother sought and obtained a Protection [f]rom Abuse Order against Father for threats the father made against her. . . . As a result, Mother and Father are no longer together. Mother is not blindly protecting Father. Mother's actions to protect herself from Father after he made a verbal threat, coupled with the fact that the medical professionals that treated L.V. had no suspicion that L.V. was abused, are evidence that Mother has protective capacity and was not ignoring L.V.'s needs. The burden of proof that Mother lacked parenting or protective capacity remains on Petitioner DHS[,] and DHS failed to present any evidence whatsoever that Mother was unable to care for her children. Without such evidence on the record, the trial court erred when it found the children to be dependent and when it ordered that no efforts be made to reunify the children with the Mother.

*Id.* at 41-42 (footnote omitted).

Our standard of review is as follows:

[T]o adjudicate a child dependent, a trial court must determine, by clear and convincing evidence, that the child:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

42 Pa.C.S.A. § 6302(1). "Clear and convincing" evidence has been defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *In re C.R.S.,* 696 A.2d 840, 843 (Pa.Super. 1997) (citation omitted).

In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see*

42 Pa.C.S.A. § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available." *In re R.T.,* [ ] 592 A.2d 55, 57 (Pa.Super. 1991) (citation omitted). This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *In re C.R.S., supra* at 845 (citation omitted).

*In re A.B.*, 63 A.3d 345, 349 (Pa.Super. 2013).

Although dependency proceedings are governed by the Juvenile Act (42 Pa.C.S.A. §§ 6301-75), the Child Protective Services Law (CPSL) "controls determinations regarding findings of child abuse, which the juvenile courts must find by clear and convincing evidence." *In Interest of N.M.*, 186 A.3d 998, 1011 (Pa.Super. 2018) (citing *In the Interest of J.R.W.*, 631 A.2d 1019 (Pa.Super. 1993)). Section 6303 of the CPSL defines child abuse as including, "intentionally, knowingly or recklessly" "[c]ausing bodily injury to a child through any recent act or failure to act" or "[c]ausing serious physical neglect of a child." 23 Pa.C.S.A. § 6303(b.1)(1),(7) (effective June 12, 2018).[12] Bodily injury is defined as "[i]mpairment of physical condition or substantial pain." 23 Pa.C.S.A. § 6303(a). Serious physical neglect is defined as follows:

Any of the following when committed by a perpetrator that endangers a child's life or health, threatens a child's well-being, causes bodily injury or impairs a child's health, development or functioning:

(1)   A repeated, prolonged or egregious failure to supervise a child in a manner that is appropriate considering the child's developmental age and abilities.

---

[12] The definition of child abuse remained the same as the prior version of the CPSL, effective October 28, 2016 to February 20, 2018.

> (2)    The failure to provide a child with adequate essentials of life, including food, shelter or medical care.

23 Pa.C.S.A. § 6303(a).

Moreover, Section 6381 of the CPSL provides, in part:

> **(d) Prima facie evidence of abuse.--**Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other person responsible for the welfare of the child shall be prima facie evidence of child abuse by the parent or other person responsible for the welfare of the child.

23 Pa.C.S.A. § 6381.

Upon careful review of the record, we discern no abuse of discretion with the trial court's determination to adjudicate the Children dependent. The record substantiates the trial court's findings that Mother and Father's conduct placed the health, safety or welfare of the Children at risk, and thus, its conclusion that the Children were dependent without parental care and control. The record further corroborates the finding of child abuse as the trial court found DHS's medical experts credible in testifying that L.V. suffered numerous fractures that were most likely caused by inflicted or non-accidental trauma. Thus, we will not disturb these findings.

As to aggravated circumstances, the Juvenile Act provides as follows:

> **(c.1)  Aggravated circumstances.--**If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from

> the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as required in section 6351(e)(3) (relating to disposition of dependent child).

42 Pa.C.S.A. § 6341(c.1). The term "[a]ggravated circumstances" is defined in part, as circumstances in which "[t]he child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by a parent." 42 Pa.C.S.A. § 6302. In turn, "serious bodily injury" is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent disfigurement or protracted loss or impairment of the function of any bodily member or organ." *Id.* Further, "aggravated physical neglect" is defined as "[a]ny omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.*

As revealed, DHS's medical expert opined that two-month-old L.V. suffered twenty-six fractures, causing pain and swelling, as a result of non-accidental trauma or abuse. Thus, the record supports the trial court's finding of aggravated circumstances based upon physical abuse to L.V. and its determination requiring no efforts toward reunification. *See* 42 Pa.C.S.A. § 6302.

With respect to Mother's claim that that trial court failed to show she exhibited a lack of parental care towards the Children, this Court has recognized that a trial court "need not find the existence of aggravated circumstances as to a particular party; rather, it merely must determine whether they are present in the case. This is … because the focus is not on

the rights of the [p]arents; instead, the children's safety, permanence, and well-being take precedence." ***In re R.P.***, 957 A.2d 1205, 1219 (Pa.Super. 2008) (citation omitted).

Accordingly, after a thorough review of the record, including the notes of testimony, the exhibits presented, the trial court opinion, and the parties' briefs, we discern no abuse of discretion in the trial court's decision to adjudicate the Children dependent and finding abuse, aggravated circumstances, and that no reasonable efforts at reunification are required.

Mother next claims error due to the trial court's delay in scheduling the dependency hearing. Mother's Brief at 36. She asserts that the trial court took over one year from the time she had obtained her expert reports and was prepared to proceed to complete the dependency hearing.

Mother, however, waived this issue by failing to raise it in the court below as the matter proceeded and was scheduled. ***See*** Pa.R.A.P. 302(a) (providing for waiver of issues not first raised in lower court).

> In order to preserve an issue for appellate review, a party must make a timely and specific objection at the appropriate stage of the proceedings before the trial court. Failure to timely object to a basic and fundamental error will result in waiver of that issue. On appeal the Superior Court will not consider a claim which was not called to the trial court's attention at a time when any error committed could have been corrected. In this jurisdiction ... one must object to errors, improprieties or irregularities at the earliest possible stage of the adjudicatory process to afford the jurist hearing the case the first occasion to remedy the wrong and possibly avoid an unnecessary appeal to complain of the matter.

*In re S.C.B.*, 990 A.2d 762, 767 (Pa.Super. 2010) (citations omitted).  As a result, we need not review this claim further.

Lastly, Mother argues that the trial court erred in suggesting that no reunification efforts would be made unless Mother or Father confessed to causing L.V.'s injuries.  Mother relies on *In re N.M.*, in which this Court found that a trial court abused its discretion in repeatedly refusing to consider approved kinship care for a child with her grandmother based on an unsupported speculation that the parents would visit the child without agency supervision.  This Court also found the trial court improperly expressed a fixed presumptive idea that the child was abused and put barriers up for reunification when her parents were fully compliant with their service plan objectives.  In addition, this Court admonished the lower court for telling the parents that they would lose their child unless one of them confessed to causing their child's injuries. *In re N.M.*, 186 A.3d at 1014 n.30.  Based on all of these observations, this Court found that the lower court had "done everything in her power to alienate [the] parents from their child." *Id*.

Upon our review of the record, we find this case distinguishable.  The trial court held numerous hearings, heard extensive testimony, and reviewed hundreds of pages of documents before concluding that Mother and Father were responsible for L.V.'s injuries.  After finding aggravated circumstances existed and directing that no reasonable efforts need to be made towards reunification, the trial court indicated the following:

>**THE COURT:** Somebody did this, okay? And I don't know which parent is responsible, but collectively, you're both responsible.
>
>There could come a time in the future in this case where one of the parties comes forward and tells us what the real truth is, and find out who was the perpetrator, or if they were both perpetrators.
>
>**I'll keep an open mind as to that.** However, the facts of this case dictate that this is a clear case of child abuse, and the City has met its burden by clear and convincing evidence. . . .

N.T., 4/16/18, at 78 (emphasis added). With an open mind towards reunification, the trial court ordered that Parents could continue visiting the Children. As a result, we reject Mother's claim that the trial court attempted to extort a confession from Parents as to L.V.'s injuries.

For the foregoing reasons, we affirm the orders of the trial court adjudicating the Children dependent, finding abuse as to both Mother and Father, and finding aggravated circumstances and that no efforts need be made toward reunification.

Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/9/19