2020 PA Super 195

| | | |
|---|---|---|
| IN THE INTEREST OF: N.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.B., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2980 EDA 2019 |

Appeal from the Order Entered September 20, 2019
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000514-2012

BEFORE: BENDER, P.J.E., LAZARUS, J., and STRASSBURGER, J.[*]

OPINION BY LAZARUS, J.: **FILED AUGUST 14, 2020**

S.B. (Mother) appeals from the order, entered in the Court of Common Pleas of Philadelphia County, removing her minor daughter, N.S. (born 9/06), from her custody, and committing N.S. to the care of the Philadelphia Department of Human Services (DHS), pursuant to section 6351 of the Juvenile Act, 42 Pa.C.S.A. §§ 6301-6375. After careful review, we reverse.

N.S. has a significant mental health history and a history of physical and verbal aggression. N.S. began mental health treatment in 2010, when she was four years old. At that time, N.S. was diagnosed with Oppositional Defiant Disorder (ODD). When N.S. was seven years old, she was hospitalized at Horsham Clinic and diagnosed with Attention Deficit Disorder (ADD). Thereafter, N.S. was admitted to Horsham Clinic's Acute Partial Program, and

---

[*] Retired Senior Judge assigned to the Superior Court.

she was diagnosed with a disruptive behavior disorder. N.S. has also been diagnosed with insulin-dependent diabetes mellitus.

On March 24, 2015, the court adjudicated N.S. dependent pursuant to section 6302(1) of the Juvenile Act. 42 Pa.C.S.A. §§ 6302(1).[1] N.S. remained in Mother's custody under court and DHS supervision. N.S. attended a specialized private school where she received services, and she participated in individual and family therapy.

From May 21, 2016 through June 19, 2016, and again from June 20, 2016 through July 26, 2016, Mother placed N.S. in Fairmount Behavioral Hospital, a residential treatment facility, to address her mental health needs. At the August 4, 2016 permanency review hearing, the court noted this. N.S. was discharged from Fairmount on January 31, 2017.

At a permanency review hearing on December 5, 2017, the court found that N.S. continued to receive services, but also continued to exhibit behavioral issues at school. At the February 16, 2018 permanency review hearing, the court found that N.S. had accrued approximately 40 incident reports during the 2017-2018 school year. On June 4, 2018, N.S.'s therapy provider recommended placement in a residential treatment facility. On July

---

[1] The dependency petition alleged that N.S. was diagnosed with attention deficit hyperactivity disorder (ADHD), posttraumatic stress disorder (PTSD), and dissociative disorder; that she was not taking any prescribed medications; that she was receiving therapeutic services at the Joseph J. Peters Institute to address a past sexual trauma; and that Mother had used physical punishment to discipline her. DHS implemented in-home protective services, but Mother requested additional assistance due to the difficulty in managing N.S.'s behaviors. Dependency Petition, 2/5/15.

19, 2018, Mother placed N.S. in Belmont Behavioral Health Hospital (Belmont) on a voluntary admission.

In August 2018, N.S.'s treating psychiatrist at Belmont recommended N.S. be referred to a residential treatment facility that could address her mental health needs as well as her medical needs as N.S. was not compliant with her diet or medication plan to control her diabetes. Several facilities, both in-state and out-of-state, declined to accept N.S. for treatment, and so she remained at Belmont.

At the August 17, 2018 permanency review hearing, the court found that N.S. remained hospitalized at Belmont on a voluntary admission. The court ordered Mother to participate in a parenting capacity evaluation (PCE). The court also ordered DHS to obtain an order of protective custody if Mother attempted to have N.S. discharged from Belmont against medical advice.

In January 2019, because an appropriate residential treatment facility remained unavailable, N.S.'s attending psychiatrist and clinical team began discharge planning rather than keeping N.S. hospitalized indefinitely. Mother agreed to work with family-based services, which included in-home family therapy, family education and skill building, 24/7 crisis intervention services, and medication management. Mother also agreed to high fidelity wraparound services, which includes a parent-support partner, who has personal experience raising a child with complex emotional needs, a youth-support partner, who is a young person with previous personal experience with

behavioral health challenges, as well as a coach and facilitators who help the family and child develop a plan to achieve shared goals.

Belmont continued to work with N.S. and Mother, and Belmont reported that both N.S. and Mother were receptive to the intensive support services and that they actively engaged in them. At a July 12, 2019 permanency review hearing, the court ordered DHS to obtain an order of protective custody to place N.S. in treatment-level foster care upon discharge from Belmont if DHS could find a foster home willing to accept her; the court also ordered DHS to explore the availability of out-of-state residential treatment centers.

In September 2019, N.S.'s treatment team at Belmont met with Mother and Community Behavioral Health (CBH) to discuss viable options for N.S. In the addendum to N.S.'s Interim Psychiatric Evaluation, N.S.'s attending psychiatrist, Chioma Iheagwara, D.O., noted:

> Due to her history of aggression, eloping from approved private school, poor medication adherence, issues with communicating effectively with adults and family[,] the treatment team met with [M]other and CBH. *Mother and Belmont are in agreement and recommend residential treatment for further stabilization in a structured setting.* Treatment foster care is not recommended given her current behaviors.

Interim Psychiatric Evaluation, June 2019-September 2019 Addendum, at 20 (electronically signed on 9/13/2019) (emphasis added).

On September 20, 2019, the court held a permanency review hearing to determine whether N.S. should remain in Mother's custody. N.S was thirteen years old at the time. At that hearing, DHS argued that the court

should remove N.S from Mother's custody and place her in DHS custody.[2]

DHS maintained that N.S. required total immersion in mental health services

---

[2] Regarding the disposition of a dependent child, section 6351(b) of the Juvenile Act provides:

> (b) Required preplacement findings.—Prior to entering any order of disposition under subsection (a) that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:
>
> > (1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and
> >
> > (2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or
> >
> > (3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or
> >
> > (4) if the court has previously determined pursuant to section 6332 (relating to informal hearing) that reasonable efforts were not made to prevent the initial removal of the child from his home, whether reasonable efforts are under way to make it possible for the child to return home; and
> >
> > (5) if the child has a sibling who is subject to removal from his home, whether reasonable efforts were made prior to the placement of the child to place the siblings together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

42 Pa.C.S.A. §§ 6351(b)(1)-(5).  Further, section 6351(e) provides in pertinent part:

> (e) Permanency hearings.—

in order for treatment to be successful, and that if Mother retained custody she could remove N.S. from the residential treatment facility at any time. Additionally, DHS stated that Mother had failed to complete her court-ordered PCE, had ceased communicating with DHS on a regular basis, and had stopped visiting N.S. *See* N.T. Permanency Review Hearing, 9/20/19, at 1-10.

Following the permanency hearing, the transcript of which amounts to a total of ten pages, the court determined there was clear and convincing evidence to establish "clear necessity" for the removal of N.S. from Mother's

_____

> (1) [t]he court shall conduct a permanency hearing for the purpose of determining or reviewing the permanency plan of the child, the date by which the goal of permanency for the child might be achieved and whether placement continues to be best suited to the safety, protection and physical, mental and moral welfare of the child. In any permanency hearing held with respect to the child, the court shall consult with the child regarding the child's permanency plan in a manner appropriate to the child's age and maturity. . . .
>
> (2) If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child has been adjudicated dependent, the court shall then determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for removing the child from the child's parent, guardian or custodian or to preserve and reunify the family shall be made or continue to be made and schedule a hearing as provided in paragraph (3).

42 Pa.C.S.A. § 6351(e).

custody and for her placement in a residential treatment facility. **See** ***In re*** ***A.L.***, 779 A.2d 1172, 1175 (Pa. Super. 2001) (following adjudication of dependency, child may not be removed from care of parent absent showing of clear necessity for removal, namely, where welfare of child requires it).[3] That same day, the court entered an order placing N.S. in the custody of DHS, **see** Permanency Review Order, 9/20/19, and N.S. remained hospitalized at Belmont.

On October 4, 2019, Mother filed a motion for reconsideration. Mother argued that the court had no basis for concluding removal from Mother's legal custody was "clearly necessary." Motion for Reconsideration 10/4/19, at 2. On November 4, 2019, the court entered an order granting a rule to show cause why Mother's motion should not be granted and scheduled a rule returnable hearing for November 14, 2019. **See** Order, 11/4/19. In the interim, however, on October 21, 2019, Mother filed a timely notice of appeal. On November 14, 2019, the court entered an order, which provides, in part: "Motion is denied as the court has lost jurisdiction." Status Review Order,

---

[3] When a trial court removes a child from his or her home, our Rules of Juvenile Court Procedure provide that the court must determine whether "the child's placement is the least restrictive placement that meets the needs of the child, supported by reasons why there are no less restrictive alternatives available[.]" **See** Pa.R.J.C.P. 1242(C)(3)(c); **see** **also** Pa.R.J.C.P. 1514(A)(2).

11/14/19. **See** 42 Pa.C.S.A. § 5505 (Modification of Orders). Both Mother and the trial court complied with Pa.R.A.P. 1925.[4]

Mother raises one issue for our review: "Did the trial court err as a matter of law and abuse its discretion by removing N.S. from Mother's custody in the absence of clear and convincing evidence that removal was clearly necessary?" Appellant's Brief, at 3. Mother does not challenge the adjudication of dependency; rather, she claims DHS did not meet its burden of proof, and therefore, the court's finding of clear necessity for removal is not supported in the record. Based on our review of the record before us, in particular, the notes of testimony from the September 20, 2019 permanency review hearing, we agree that the evidence was insufficient to support the trial court's placement of N.S. in the legal custody of DHS.

When reviewing a dependency case, we accept the trial court's findings of fact and credibility determinations that are supported in the record. However, we are not required to accept the court's inferences or conclusions of law. **In re R.J.T.**, 9 A.2d 1179, 1190 (Pa. 2010). We review for an abuse of discretion. **In Interest of L.Z.**, 111 A.3d 1164, 1174 (Pa. 2015).

In **In re D.A., A Minor**, 801 A.2d 614 (Pa. Super. 2002) (en banc), we explained:

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to

---

[4] The guardian *ad litem* on behalf of N.S. joined in the brief filed by the City Solicitor's Office for DHS.

remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).

*Id.* at 617 (citation omitted). *See In re M.L.*, 757 A.2d 849, 850–51 (Pa. 2000). However, even after a child has been adjudicated dependent, a court may not separate that child from his or her parent unless it finds that the separation is clearly necessary. 42 Pa.C.S.A. § 6301(b)(3); *In re G.T.*, 845 A.2d 870 (Pa. Super. 2004). "'Such necessity is implicated where the welfare of the child demands that he [or she] be taken from his [or her] parents' custody.'" *Id.* at 873 (citations omitted) (alterations in original). Clear necessity is established when the court determines that alternatives are not feasible. *A.N. v. A.N.*, 39 A.3d 326 (Pa. Super. 2012). After review, we conclude that DHS did not establish clear necessity for removal.

At the September 20, 2019 hearing, Mother was unavailable due to medical issues. Mother was, however, represented by counsel, who appeared on her behalf. N.T. Permanency Review Hearing, *supra* at 2. At the time of the hearing, N.S. remained hospitalized at Belmont, and Belmont's psychiatric evaluation of September 13, 2019, as indicated above, recommended residential treatment for N.S. *See* Interim Psychiatric Evaluation, June 2019-September 2019 Addendum, *supra* at 20. Mother agreed with this recommendation. *See id.* At the hearing, counsel for Mother stated:

Ms. Buck: Your Honor, my client is in agreement with [residential treatment facility] placement. And as CBH has approved the placement there's no need for a commit for her to be able to go to RTF placement.

The Court: Okay.

Ms. Buck: It could be just a mental health placement, so I ask that the order be [DHS] supervision to stand, and that [N.S.] can go to RTF when placement is located[.]

N.T. Permanency Review Hearing, *supra* at 8. Counsel for DHS argued as follows:

Ms. Pontious: And, Your Honor, I would be asking for the commit, the reason being that Your Honor had previously ordered once she was ready for discharge for us to get an [order for protective custody] due to the issues of mom. The issue is that if she's in an RTF, [Mother] still retains legal custody as opposed to the department. She can sign her out if she wants, and there's as you know, Your Honor, the history of this case there's a lot of issues.

The Court: I'll commit the child.

*Id.* at 9.

We agree, "there [are] a lot of issues" in this case. N.S. has multiple psychiatric diagnoses, poorly controlled verbal and physical aggression impulses, and a history of noncompliance in managing her diabetes, as well as a history of defiant and sexualized behavior and running away from home. None of this, however, supports a finding that it is clearly necessary to remove N.S. from Mother's custody, especially where Mother *agrees that N.S. requires placement in a residential treatment facility,* has other young children at home, and has been supportive and consistently engaged in N.S.'s treatment throughout her life, as noted extensively in the record by the attending psychiatrists. *See* N.T. Permanency Review Hearing, *supra* at 8 ("Your Honor, my client is in agreement with RTF [residential treatment facility]

placement."); Belmont Interim Psychiatric Evaluation, June 2019-September 2019 Addendum, at 20 ("Mother and Belmont are in agreement and recommend residential treatment for further stabilization in a structured setting."); *see also* Belmont Interim Psychiatric Evaluation, *supra*, December 2018 Addendum, Steve Cartun, M.D. ("[M]other . . . has been pretty actively involved during [N.S.'s] stay here."); January 2019 Addendum, Chioma Iheagwara, D.O. ("The treatment team continued to work with [N.S.], her mother, her stepfather and her clinical team. Mother continued to be an advocate for her daughter and supports the team's efforts in health maintenance."); June-September 2019 Addendum, Chioma Iheagwara, D.O. ("Mother would join with the team in stressing the importance of following unit rules."); Comprehensive Behavioral Psychiatric Evaluation, 12/19/17, Roomana M. Sheikh, M.D. ("[N.S.'s] mother is very involved and a strong advocate for her daughter.").

In August 2018, Mother supported Belmont's recommendation that N.S. enter a residential treatment facility, but no facility would accept N.S. at that time. Doctor Iheagwara noted, "[M]other loves her child and is open to significant supports to maintain [N.S.] in the community." Belmont Interim Psychiatric Evaluation, January 2019 Addendum, Chioma Iheagwara, D.O., at 15-16. These "significant supports" included family-based services, high-fidelity wraparound services, in-home nursing support and medical case management. From all accounts, it appears that Mother has followed and supported the recommendations of the treatment team. There was no

evidence presented at the hearing that indicated Mother is a barrier to N.S.'s treatment.

In its opinion, the trial court relies on brief testimony from the Community Umbrella Agency caseworker, Tracy McNair, who stated that Mother had not completed her PCE or contacted McNair since the last court date.[5]  N.T. Permanency Review Hearing, *supra* at 6.  Notably, there was no indication at that hearing that Mother's lack of communication with McNair presented an obstacle to N.S.'s treatment or the clear goal of placement in an appropriate residential treatment facility.  Significantly, there was no evidence that Mother was incapable or unwilling to consent to N.S.'s admission into residential treatment.  *See A.N.*, *supra* at 330 ("It is this Court's responsibility to ensure that the record represents a comprehensive inquiry and that the hearing judge has applied the appropriate legal principles to that record.").

Based on our review, we agree with Mother's argument that DHS presented no evidence that established Mother's exercise of her legal custody rights was detrimental to N.S.'s welfare and that DHS's argument that Mother might remove N.S. from residential treatment was unfounded.  Notably,

---

[5] In the Belmont Interim Psychiatric Evaluation, Dr. Iheagwara noted there was a period of approximately three weeks when the clinical team was unable to reach Mother.  Doctor Iheagwara stated, "Mother reports that her phone was misplaced with all of her contacts and she had to obtain a new phone. Once communication was reestablished Mother was more consistent in communicating with the treatment team as well as with her daughter." Belmont Interim Psychiatric Evaluation, June-September 2019 Addendum, *supra* at 20.

Mother has not sought to remove N.S. against medical advice, and instead has followed the treatment recommendations from Belmont staff since the start of N.S.'s hospitalization.

We find nothing in the record that indicates anything other than the fact that Mother has been supportive and encouraging of the treatment team's recommendations, in particular, residential treatment. Further, there is nothing in the record that indicates Mother is opposed to agency supervision or N.S.'s "total immersion in mental health services[.] *See* Trial Court Opinion, 1/9/20, at 3. Neither the 10-page transcript of the permanency review hearing, nor the trial court's 3-page opinion, exhibits the comprehensive inquiry required in a removal case, or explains why removal of N.S. from Mother's custody promotes N.S.'s best interests or welfare. *See In re R.W.J.*, 826 A.2d 10, 12 (Pa. Super. 2003); *In re G.T.*, *supra* at 873; *see also Interest of S. M. S.*, 424 A.2d 1365, 1369 (Pa. Super. 1981) (hearing judge should conduct comprehensive inquiry and support decision in opinion discussing and analyzing evidence fully).

Where the record indicates Mother has supported and advocated for her daughter's mental and physical health, and Mother is in agreement with the treatment team's and DHS' recommendation for residential treatment and the agency's protective supervision, we are unable to accept the court's conclusion that DHS has established by clear and convincing evidence that removal is "clearly necessary." *Id*. Mother's failure to complete her PCE and the court's speculation that it is possible that Mother could remove N.S. from treatment

"at any time[,]" without more, is insufficient to establish a "clear necessity" for N.S.'s removal from Mother's custody. ***Id.*** The trial court's findings are not supported by the record, and we conclude, therefore, that N.S.'s health, safety, and welfare do not mandate removal of custody from Mother.

We encourage Mother to continue her steadfast support for N.S.'s health and well-being and to continue to work with the agency. We recognize, as the treatment team does, that Mother is an integral part of her daughter's mental and physical health management.

Order reversed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/14/20