J-S27020-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: M.W., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: Y.W., MOTHER | : : : : : : : | |
| | : | No. 1021 EDA 2022 |

Appeal from the Order Entered March 17, 2022
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0001115-2021

BEFORE:  STABILE, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 1, 2022**

Appellant Y.W. (Mother) appeals from the order adjudicating M.W. (Child) dependent.  Mother claims that the evidence was insufficient to support the dependency allegations, that the trial court abused its discretion in adjudicating Child dependent and in finding reasonable efforts were made by the Philadelphia Department of Human Services (DHS) to prevent the removal of Child from the home, and that the court violated Mother's right to due process of law.  We affirm.

The relevant facts and procedural history are well known to the parties. **See** Trial Ct. Op., 5/5/22, at 1-4.  Briefly, DHS became involved with the family on September 10, 2021, after receiving a general protective services (GPS) report.  N.T. Hr'g, 3/17/22, at 7, 20-22.  The report alleged that Child had come home from school and discovered Mother unconscious.  **Id.**  Mother, who had a history of drug use which may have included phencyclidine (PCP),

was transported to the Hospital of the University of Pennsylvania (HUP) after Child called 911. *Id.* at 8, 15-18.

Child and Maternal Aunt confirmed to DHS caseworkers that Mother had a history of drug addiction. *Id.* at 9-11. Mother admitted her own drug usage to caseworkers. *Id.* As a result of the incident, DHS placed Child in the home of Maternal Aunt. *See* Trial Ct. Op. at 1. DHS developed a safety plan and met with Mother on October 13, 2021. *Id.* At that time, Mother refused to sign consent forms and claimed that her drug use was solely recreational. *Id.*

On October 29, 2021, DHS filed a dependency petition for Child.[1] The trial court held an adjudicatory hearing on March 17, 2022. At the hearing, DHS presented testimony from DHS investigator Channel Jones and Community Umbrella Agency (CUA) case manager Kim Sharpton. Mother testified on her own behalf. Maternal Aunt was present at the hearing but was not called to testify.

Channel Jones testified that she was the DHS investigator assigned to Child's case. N.T. Hr'g, 3/17/22, at 6-15. During her testimony, Ms. Jones described the circumstances leading up to Child's removal from the home. *Id.* Ms. Jones stated that when Mother was transported to the hospital, she had an injury to her arm and there were reports from the hospital stating that she had PCP in her system. *Id.* at 8-9. Ms. Jones also stated that during the DHS

---

[1] DHS attempted to serve D.S. (Father) the dependency petition via United Parcel Service (UPS), but the petition was refused and returned to sender. N.T. Hr'g, 3/17/22, at 6. At the time of the dependency hearing on March 17, 2022, Father's whereabouts were unknown. *Id.*

investigation, she spoke with Child, Mother, and Maternal Aunt. *Id.* at 9, 18-21. Mother, whose arm was visibly injured, admitted to using PCP and "other drugs." *Id.* Mother did not state how long she had been using PCP or disclose any history of mental health issues. *Id.* at 10. Based upon her conversations with Mother, Ms. Jones stated that she had concerns about Mother's mental health and substance use due to Mother's slurred speech and inability to form coherent sentences or participate in their conversations. *Id.* at 8-20. Ms. Jones also testified that when she spoke to Child, he confirmed Mother's history of substance use. *Id.* at 11.

Ms. Sharpton testified that she was assigned to Child's case on October 7, 2021. *Id.* at 15-22. Ms. Sharpton stated that Mother admitted to using drugs during their initial interview. *Id.* at 15. When Ms. Sharpton asked Mother about her drug usage, Mother replied that she "uses all of them." *Id.* at 16. Ms. Sharpton also spoke to Maternal Aunt, who confirmed Mother's history of substance use. *Id.* at 17.

Mother then testified on her own behalf. With respect to the incident leading to the GPS report, Mother initially testified that she fell and injured herself due to arthritic knees. *Id.* at 24. Mother also denied being unconscious when Child came home from school. *Id.* at 19-24. Despite her earlier claim of arthritic knees, Mother then testified that she had spilled water on the floor, which caused her to fall and hit her shoulder on the washing machine. *Id.* at 25. Further, Mother denied that she had admitted to using drugs during her interviews with DHS. *Id.* at 27.

At the conclusion of the hearing, the trial court adjudicated Child dependent. *Id.* at 33; *see also* Order of Adjudication, 3/17/22, at 1. The court found that it was in Child's best interest to be removed from the home, that it would be contrary to Child's welfare to remain in the home, and that DHS had made reasonable efforts to prevent Child's removal. Order of Adjudication, 3/17/22, at 1-2.

Mother filed a timely notice of appeal and complied with Pa.R.A.P. 1925(a)(2)(i). The trial court issued a Pa.R.A.P. 1925(a) opinion addressing Mother's claims.

On appeal, Mother raises the following issues for our review:

1. Did [the trial court err] in law and/or [abuse] its discretion when it adjudicated the above-named Child [dependent] without clear and convincing evidence to substantiate the allegations set forth in the petition?

2. Did [the trial court err] in law and/or [abuse] its discretion when [it] determined that the Child was without proper care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental and emotional health or morals?

3. Did [the trial court err] in law and/or [abuse] its discretion when it adjudicated the above-named Child [dependent] and determined that it was in the best interest of the Child to be removed from the home of Mother?

4. Did [the trial court err] in law and/or [abuse] its discretion when it adjudicated the above-named Child [dependent] when it determined that DHS made reasonable efforts to prevent or eliminate the need for removal of the Child from the home?

5. Did [the trial court err] in law and/or [abuse] its discretion when it adjudicated the above-named Child [dependent and] denied due process of law to Mother as [guaranteed] by the

Constitution of the Commonwealth of Pennsylvania and [the] Constitution of the United States of America?[2]

Mother's Brief at 5 (formatting altered).

**Adjudication of Dependency**

For ease of analysis, we address Mother's first two issues together. Mother first argues that the trial court erred in adjudicating Child dependent because there was insufficient evidence to substantiate the allegations of drug use. Mother's Brief at 9. Specifically, Mother emphasizes that she denied the allegations of drug use at the dependency hearing and there was no documentary evidence to prove that she used PCP or any other drugs.[3] *Id.* at 10-11. Additionally, Mother contends that the court erred in finding that Child was without proper care or control, subsistence, or education, as Child

---

[2] In support of her due process argument, Mother cites a single United States Supreme Court case which discusses the standards for the termination of parental rights, and not an adjudication of dependency. Mother's Brief at 14-15 (citing *Santosky v. Kramer*, 455 U.S. 745, 747-48 (1982) (holding that before a state may completely and irrevocably sever a parent's rights to their children, due process requires that the state support its allegations by at least clear and convincing evidence)). Accordingly, Mother has waived her due process argument due to her failure to properly develop her argument and cite to relevant authority. *See*, *e.g.*, *In re A.P.*, 920 A.2d 1269, 1275 (Pa. Super. 2007) (finding an issue waived where mother failed to develop her claim or cite any authority in support of her argument).

[3] Additionally, Mother argues that Ms. Jones' testimony regarding statements by Mother and Child was inadmissible hearsay. Mother's Brief at 10-11. However, Mother did not raise this issue in her concise statement of errors complained of on appeal or her statement of questions presented on appeal. Therefore, this claim is waived. *See In re M.Z.T.M.W.*, 163 A.3d 462, 466 (Pa. Super. 2017) (reiterating that issues not included in a concise statement of errors complained of on appeal and statement of questions involved are waived).

had an appropriate home and was doing well in school. *Id.* at 11-13. Therefore, Mother concludes that the court's dependency adjudication was in error. *Id.*

> In reviewing Mother's claims, our standard of review is as follows:

> In reviewing an order in a dependency matter, our standard of review requires us to accept the findings of fact and credibility determinations of the trial court if they are supported by the record but does not require the appellate court to accept the lower court's inferences or conclusions of law. Accordingly, we review for an abuse of discretion.

*In re N.B.*, 260 A.3d 236, 245 (Pa. Super. 2021) (citation and quotation marks omitted); *see also In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004) (citation omitted) (recognizing that the trial court is "free to believe all, part, or none of the evidence presented, and is likewise free to make all credibility determinations and resolve conflicts in the evidence" (citations omitted)). In child dependency proceedings, the health and safety of the child "supersede[s] all other considerations." *In re R.P.*, 957 A.2d 1205, 1220 (Pa. Super. 2008).

To adjudicate a child dependent, the trial court must find that the child meets the statutory definition of a dependent child by clear and convincing evidence. *In re A.B.*, 63 A.3d 345, 349 (Pa. Super. 2013) (citations omitted).

> The statutory definition of a dependent child is a child who

> > is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based **upon evidence of**

> **conduct by the parent, guardian or other custodian
> that places the health, safety or welfare of the child
> at risk, including evidence of the parent's, guardian's
> or other custodian's use of alcohol or a controlled
> substance that places the health, safety or welfare of
> the child at risk** . . . .

42 Pa.C.S. § 6302 (emphasis added).

Further, this Court has described the "clear and convincing" evidentiary standard as follows:

> Clear and convincing evidence has been defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.
>
> In accordance with the overarching purpose of the Juvenile Act to preserve the unity of the family whenever possible, a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. This Court has defined proper parental care as that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child.

*A.B.*, 63 A.3d at 349 (citations omitted and formatting altered).

Additionally, following an adjudication of dependency, this Court has explained:

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S. § 6351(a).
>
> However, even after a child has been adjudicated dependent, a court may not separate that child from his or her parent unless it finds that the separation is clearly necessary. 42 Pa.C.S. § 6301(b)(3). Such necessity is implicated where the welfare of the

child demands that he or she be taken from his or her parents' custody. Clear necessity is established when the court determines that alternatives are not feasible.

*In re N.S.*, 237 A.3d 546, 550-51 (Pa. Super. 2020) (some citations omitted and formatting altered); *see also In re A.C.*, 237 A.3d 553, 565 (Pa. Super. 2020).

In applying the clear and convincing evidence standard, our Courts have stated that suspicions, innuendo, and conjecture are insufficient. *See*, *e.g.*, *In re N.B.-A.*, 224 A.3d 661 (Pa. 2020); *see also In re J.M.*, 166 A.3d 408 (Pa. Super. 2017). In *J.M.*, this Court reversed a trial court order finding that the child had been abused. Specifically, the *J.M.* Court noted that although there was evidence that the child had a broken arm, the doctor had testified that it was a common accidental injury for children of that age. *Id.*, 166 A.3d at 412, 427. Further, the Court explained that "suspicions are not a substitute for clear and convincing evidence." *Id.* at 427 (citation omitted). Therefore, the Court concluded that "[a]lthough the trial court was free to rely on its findings about [the m]other's testimony, it could not, as a matter of law, find that the [c]hild was abused solely on that basis." *Id.*; *see also N.B.-A.*, 224 A.3d at 672 (noting that "although we are troubled by [m]other's initial false statements to CHOP regarding the male residents of her household, those statements in and of themselves are insufficient to establish, under a clear and convincing evidence standard, that, prior to the time she made those statements, [m]other knew or should have known of a danger posed to [c]hild by [s]tepbrother, or that [m]other disregarded warning signs of potential

- 8 -

abuse. **To conclude otherwise would be mere conjecture**" (emphasis added)).

The general rule about lay opinion for medical conditions is "a lay witness may testify about the apparent physical condition of a person. However, they are barred from testifying to the existence or non-existence of a disease, the discovery of which requires the training and experience of a medical expert." *In re Involuntary Commitment of Barbour*, 733 A.2d 1286, 1288 (Pa. Super. 1999) (citation omitted). However, a witness can offer a lay opinion about intoxication if it is based on the witness's personal knowledge and observations. *See Commonwealth v. Bowser*, 624 A.2d 125, 133 (Pa. Super. 1993).

Instantly, the trial court determined that Child was without proper care and control due to Mother's continued use of controlled substances and the September 10, 2021, incident in which Child found Mother unresponsive. *See* Trial Ct. Op. at 6. Specifically, the trial court explained:

> The GPS report further alleged that Mother used PCP earlier that day, and that Mother had a history of using PCP. Ms. Jones testified that the GPS report was valid and named Mother as the responsible party. When Ms. Jones spoke to Mother about the allegations in the GPS report, Mother admitted to using PCP and "other drugs." Mother also admitted to CUA case manager, Ms. Sharpton, that she used drugs. When Ms. Sharpton asked Mother about her drug of choice, Mother stated that she "uses all of them." Mother's history of substance abuse was also confirmed by [Child] and Maternal Aunt. While Mother did not disclose any history of mental health issues, Ms. Jones expressed that based on her conversations with Mother, she had concerns regarding Mother's mental health as well as drug and alcohol use because of

Mother's slurred speech and inability to form sentences or hold a conversation.

The allegations in the valid GPS report greatly concern this court. This court has concerns with Mother's ability to provide adequate care for [Child] given her history of substance use, being found unresponsive and the report of being positive for PCP. This court found that Mother's substance use impacted her ability to provide adequate parental care to [Child] and placed [Child's] safety and well-being at risk.

After hearing the evidence presented, this court found that DHS met its burden by clear and convincing evidence that [Child] was a dependent child pursuant to 42 Pa.C.S. § 6302(1) and was without proper parental care. Such proper parental care was not immediately available due to the concerns involving Mother's ongoing substance abuse as well as mental health. This court did not find Mother's testimony denying the allegations in the GPS report to be credible. The testimony heard was clear and convincing that [Child's] health and safety was at risk, and thus [Child] was adjudicated dependent.

*Id.* at 6-7 (some formatting altered).

We reiterate that Mother waived her challenge to the admission of hearsay evidence but note that DHS must still prove its case by producing evidence that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." *See A.B.*, 63 A.3d at 349 (citation omitted).

In support of its dependency petition, DHS presented its GPS report stating that Mother had been taken to the hospital after Child discovered Mother unconscious and called 911. DHS also presented testimony from caseworkers who stated that Mother tested positive for PCP at the hospital, that Mother appeared to be suffering from mental health issues. Caseworkers also testified that Mother had slurred speech and appeared to be intoxicated.

DHS did not present any hospital reports, medical reports, or expert witnesses to establish that Mother had tested positive for PCP at the hospital or at any other time. *See*, *e.g.*, Pa.R.E. 702.

Likewise, there was no report or expert testimony establishing that Mother was struggling with mental health issues, or that she was diagnosed or treated by a qualified professional for any mental illness. Competent medical expert testimonial or documentary evidence of mental health diagnosis and treatment rather than lay testimony would be required pursuant to Pa.R.E. 702 to support the trial court's conclusions that Mother had a history of mental health issues. *See id.*; *see also Barbour*, 733 A.2d at 1288. Similarly, the record did not establish that Mother had PCP in her system and any testimony to this effect, absent more, amounted to "mere conjecture." *See*, *e.g.*, *N.B.-A.*, 224 A.3d at 672.

However, DHS caseworkers **were** permitted to provide their lay opinion regarding Mother's slurred speech and intoxicated state, although they could not testify regarding her mental health or any diagnosis regarding her mental health. *See Bowser*, 624 A.2d at 133. Additionally, it was proper for the trial court to consider the evidence in the GPS report that Mother, Child, and Maternal Aunt all confirmed Mother's history of drug addiction.[4] N.T. Hr'g, 3/17/22, 9-11, 17; *see also Barbour*, 733 A.2d at 1288; *see also Bowser*, 624 A.2d at 133. However, there is no indication in the GPS report that either

_____

[4] As noted above, Maternal Aunt was present and available to testify at the hearing but was not called as a witness by either party.

Child or Maternal Aunt was aware that Mother took PCP the day of the incident. Additionally, the trial court noted Mother's testimony regarding the allegations in the direct report, her changing story, and specifically found her testimony not credible.  *See* Trial Ct. Op. at 7.

When examining all of the evidence presented at the hearing, we reiterate that the trial court's primary concern should be the health and safety of the child.  *See R.P.*, 957 A.2d at 1220.  Accordingly, following our review, we conclude that the record supports the trial court's findings.  *See A.B.*, 63 A.3d at 349.  As noted by the trial court, DHS presented clear and convincing evidence that Mother's substance use placed Child's safety and well-being at risk and caused Child to be without proper parental care or control.  *See* Trial Ct. Op. at 6-7.  Further, because Mother's substance use was ongoing, the trial court properly concluded that Mother was not able to immediately provide proper care for Child.  *See* 42 Pa.C.S. § 6302; *A.B.*, 63 A.3d at 349.  Finally, to the extent Mother challenges the credibility of DHS's witnesses, we decline to reweigh the evidence or interfere with the trial court's credibility determinations.  *See N.B.*, 260 A.3d at 245 (noting that our standard of review requires us to accept the credibility determinations of the trial court if they are supported by the record); *see also M.G. & J.G.*, 855 A.2d at 73-74 (noting that the trial court is free to make credibility determinations and resolve conflicts in the evidence).  Therefore, the trial court did not abuse its discretion by adjudicating Child dependent.  *See N.B.*, 260 A.3d at 245.

**Removal and Reasonable Efforts**

Mother combines her third and fourth issues in her brief, and we address them together for ease of analysis. Mother's Brief at 13-14. First, Mother argues that the trial court committed an error of law and abused its discretion when finding that removal was in Child's best interest. Mother argues that removal was not in Child's best interests because Child wants to see Mother but feels uncomfortable asking to do so, and that removal is "severing the bond between the Child and Mother." *Id.* at 14. Additionally, Mother contends that there was no evidence of reasonable efforts to prevent the need for the removal of Child from Mother's home and argues that Child was removed solely due to unsubstantiated allegations of Mother's drug use. *Id.* at 13-14.

We reiterate that this Court has explained that if a child is adjudicated dependent, the trial court may make an appropriate disposition to protect the child's welfare, including removal from a parent's custody. *N.S.*, 237 A.3d at 550-51. The standard for removal is also clear and convincing evidence. *Id.*

Additionally, prior to removing a child from his home, the trial court must also find that DHS made "reasonable efforts . . . prior to the placement of the child to prevent or eliminate the need for removal of the child from his home . . . ." 42 Pa.C.S. § 6351(b)(2). This Court has observed that

> neither federal nor Pennsylvania law defines "reasonable efforts." Notwithstanding the lack of a legal definition, we discern the following from prior cases. Because the focus of the Juvenile Act is on the dependent child, as opposed to parents, any services for parents must directly promote the best interests of the child. By requiring only "reasonable efforts" to reunify a family, the statute recognizes that there are practical limitations to such efforts. It

- 13 -

is not sufficient for the court to find simply that an action will promote family reunification; the court must also determine whether the action constitutes a **reasonable** effort towards reunification. This Court has stressed that the agency is not expected to do the impossible and is not a guarantor of the success of the efforts to help parents assume their parental duties.

*In re C.K.*, 165 A.3d 935, 941-42 (Pa. Super. 2017) (citations and footnote omitted, formatting altered, emphasis in original).

Here, the trial court concluded that Child's continued presence in Mother's home "would be contrary to his safety and welfare" in light of "the allegations in the GPS report involving Mother's current substance use and the ongoing concerns for [Child's] safety and welfare in Mother's care . . . ." Trial Ct. Op. at 9. Further, with regard to DHS's efforts to prevent removal, the trial court explained that DHS developed a safety plan when Child was placed in kinship care with his Maternal Aunt. *Id.* at 9. However, "Mother was provided a copy of the safety plan but refused to sign consent forms for DHS." *Id.*

Following our review, we conclude that the record supports the trial court's determinations. *See N.B.*, 260 A.3d at 245. Based upon Mother's alleged issues with drug use, supported by the clear and convincing evidence of the record, the trial court appropriately determined that Child's removal from the home was the outcome best suited "to the protection and physical, mental, and moral welfare of the child" and was in Child's best interests. *See A.C.*, 237 A.3d at 565 (citations omitted).

Further, the record reflects that DHS prepared a safety plan for Child, but Mother refused to sign the consent forms or the safety plan. Pennsylvania courts do not expect DHS to do the impossible where, for example, a parent refuses to cooperate with efforts to establish a safety plan. *See*, *e.g.*, *C.K.*, 165 A.3d at 942. Therefore, the record supports the trial court's determination that DHS had made reasonable efforts to prevent removal of Child from Mother's care. *See id.*; *A.B.*, 63 A.3d at 349-50. Accordingly, we affirm.

Order affirmed.

Judge Stabile concurs in the result.

Judge Sullivan concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 11/1/2022