J-A21010-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: K.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1337 EDA 2024 |

Appeal from the Order Entered April 23, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000109-2024

| | | |
|---|---|---|
| IN THE INTEREST OF: K.C., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: R.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1339 EDA 2024 |

Appeal from the Order Entered April 23, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000142-2024

| IN THE INTEREST OF: K.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: R.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1342 EDA 2024 |

Appeal from the Order Entered April 23, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000143-2024

| IN THE INTEREST OF: A.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: R.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1344 EDA 2024 |

Appeal from the Order Entered April 23, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000144-2024

BEFORE:  KUNSELMAN, J., NICHOLS, J., and BECK, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED OCTOBER 16, 2024**

In this consolidated matter, R.H. (Mother) appeals the orders issued by the Philadelphia County Court of Common Pleas, which adjudicated dependent her four children: three-month-old K.H.; two-year-old K.C.; four-year-old K.W.; and six-year-old A.W. (collectively, the Children) pursuant to the

Juvenile Act. *See* 42 Pa.C.S.A. §§ 6302, 6351. After careful review, we affirm.

In its opinion issued pursuant to Pa.R.A.P. 1925(a), the juvenile court set forth the following history:

> The Philadelphia Department of Human Services (DHS) has been aware of this family since 2021 due to concerns about Mother's substance use. On January 4, 2024, DHS received a General Protective Services (GPS) report alleging that Mother and K.H. tested positive for cocaine and methadone at K.H.'s birth [in January 2024]. The report alleged K.H. was suffering from withdrawal symptoms and was being administered morphine. The GPS report was determined to be valid.

> The remaining three children, K.C., K.W., and A.W., began residing with their maternal aunt on or around January 24, 2024, after DHS implemented an out-of-home Safety Plan. On February 8, 2024, DHS learned that K.H. was ready for discharge from the hospital. That day, DHS obtained an Order of Protective Custody (OPC) for K.H. and placed him in the care of his maternal aunt. At the February 9, 2024, shelter care hearing, the OPC was lifted and the temporary commitment to DHS was ordered to stand.

> The Adjudicatory Hearing for the Children was held on April 19, 2024. Counsel for DHS called their first witness, DHS Investigator, Shaday Walker. (N.T. 4/19/2024, p. 8-21 (Exhibit A)). Ms. Walker testified that DHS received a GPS report on January 4, 2024, alleging that Mother and K.H. tested positive for cocaine and methadone at K.H.'s birth. When Ms. Walker interviewed Mother at the hospital regarding the allegations, Mother admitted that she was prescribed methadone, but denied cocaine use. At that time, K.H, was admitted to the Neonatal Intensive Care Unit (NICU). Ms. Walker testified that K.H. was being administered morphine because he was experiencing withdrawal symptoms. During her investigation, Ms. Walker also learned that Mother had a prior valid GPS report from December 30, 2021, wherein another child also tested positive for substances at birth. (N.T. 4/19/2024, p. 8 at 12-

25; p. 9; p. 10 at 1-18 (Exhibit A)). Ms. Walker also visited Mother's home on January 24, 2024, after she was discharged from the hospital. Ms. Walker testified that Mother appeared to be under the influence during her visit, was "stumbling over her words," and expressed suicidal ideations. At that time, DHS requested an out-of-home Safety Plan [] for the three children still in Mother's care, K.C., K.W., and A.W. (N.T. 4/19/2024, p. 13 at 6-12; p. 14 at 1-7 (Exhibit A)). During her investigation, Ms. Walker also learned that K.C., K.W., and A.W. received medical and dental care through Philly FIGHT. However, a representative at Philly FIGHT informed her that they were "severely behind" on medical and dental care. Ms. Walker further testified that two of the Children, K.C. and K.W., also required oral surgery for tooth decay. However, they were unable to receive the necessary surgery because maternal aunt did not have authorization from Mother. (N.T. 4/19/2024, p. 14 at 24-25; p. 15 at 1-15 (Exhibit A)).

Ms. Walker testified that her safety concerns included Mother's substance use history, her active drug use, her history of failing to complete drug and alcohol treatment, as well as mental health and domestic violence history. She also testified that Mother did not receive prenatal care for K.H. At the Adjudicatory Hearing, Ms. Walker recommended that Mother engage in mental health and drug and alcohol treatment for six to twelve months before being reunified with the Children. (N.T. 4/19/2024, p. 13 at 3-6; p. 14 at 8-20; p. 16 at 2-11 (Exhibit A)).

Counsel for DHS called their next witness, Community Umbrella Agency (CUA) Case Manager, Terrence Holmes. (N.T. 4/19/2024, p. 21-30 (Exhibit A)). Mr. Holmes testified that he was assigned to this family's case on April 3, 2024. He testified that Mother received treatment at Family House Now since January 2024. Mr. Holmes further testified that Mother visited the Children consistently at the CUA agency and at the maternal aunt's home. (N.T. 4/19/2024, p. 24 at 1-10; p. 25 at 10-19 (Exhibit A)).

Counsel for Mother then called the Child Development Specialist at Family House Now, Raquel Mabry to testify. (N.T. 4/19/2024, p. 30-37 (Exhibit A)). Ms. Mabry testified that Family House Now was a mommy and me recovery program. Ms. Mabry testified that Mother's treatment

included drug and alcohol recovery, mental health therapy, and "parenting through sobriety." Mother also received trauma counseling at JJPI and medication assistance treatment through the family center. She further testified that Mother received medication to assist with her recovery and had not tested positive for any other substances since beginning treatment. Ms. Mabry also testified that Family House Now would be able to facilitate reunification of Mother with K.H. and K.C. if ordered by the Court. (N.T. 4/19/2024, p. 30 at 18-25; p 31-32; p. 34 at 3-7 (Exhibit A)). When questioned by the Court, Ms. Mabry testified that Family House Now does not have a "blackout" period and Mother would be able to leave the facility at will. (N.T. 4/19/2024, p. 36 at 17-20 (Exhibit A)).

Following argument of counsel on April 19, 2024, [the juvenile court] found that there was clear and convincing evidence to adjudicate the Children dependent based on present [Mother] inability and fully commit[ed] them to DHS.

Trial Court Opinion (T.C.O.) dated 6/6/24 at 1-4 (footnote omitted).

We clarify that the Children were committed to the legal custody of DHS. They were placed in the physical custody of Maternal Aunt, but the court ordered CUA to conduct a home evaluation of Father's residence and interview his spouse to determine if she would allow the Children to be placed with Father. *See* T.C.O. at 13. The court ordered that K.C., and the infant K.H. could be reunified with Mother prior to the following permanency review hearing by agreement of the child-advocate. *Id.*

Mother timely filed this appeal. She presents the following issues for our review:

1. Did the trial court err as a matter of law and abuse its discretion by adjudicating K.H., K.C., K.W., and A.W. to be "dependent" children pursuant to 42 Pa.C.S.A. § 6302 in the absence of clear and convincing evidence

- 5 -

that K.H., K.C., K.W., and A.W. were "without proper parental care and control...as required by law?"

2. Did the trial court err as a matter of law and abuse its discretion by committing K.H., K.C., K.W., and A.W. to the legal custody of [DHS] in the absence of clear and convincing evidence that removal from Mother was clearly necessary?

3. Did the trial court err as a matter of law and abuse its discretion by committing K.H., K.C., K.W., and A.W. to the legal custody of the Department of Human Services in the absence of clear and convincing evidence that [DHS] made reasonable efforts to prevent or eliminate the need for removal of K.H., K.C., K.W., and A.W. from Mother's home pursuant to 42 Pa.C.S.A. § 6351(b)?

Mother's Brief at 4.

In her first issue, Mother challenges the juvenile court's determination that DHS proved that the Children were dependent by clear and convincing evidence. To adjudicate a child dependent, the court must determine, by clear and convincing evidence, that the child:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

42 Pa.C.S.A. § 6302(1).

"Clear and convincing evidence" is defined as testimony that is "so clear, direct, weighty, and convincing as to enable the trier of facts to come to a

- 6 -

clear conviction, without hesitancy, of the truth of the precise facts in issue."

***Interest of L.V.***, 209 A.3d 399, 416 (Pa. Super. 2019) (citation omitted).

> In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," ***see*** 42 Pa.C.S.A. § 6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. This Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child."

***L.V.***, 209 A.3d at 416 (internal citations omitted).

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the juvenile court if they are supported by the record; but it does not require the appellate court to accept the juvenile court's inferences or conclusions of law. ***Interest of I.R.-R.***, 208 A.3d 514, 519 (Pa. Super. 2019) (citing ***In re R.J.T.***, 9 A.3d 1179, 1190 (Pa. 2010)).

Returning to the instant matter, the juvenile court determined that DHS met its burden that the Children were without parental care. The juvenile court noted that the youngest Child, K.H., tested positive for cocaine and methadone at birth, in January 2024 – three months before the adjudicatory hearing. As a result, K.H. spent a month in the neonatal intensive care unit (NICU). The court also noted the caseworker's testimony that Mother appeared to be under the influence of drugs during a home visit that same month. The court said its primary concern was Mother's substance abuse, but

that there were other concerns – namely, the older Children's lack of medical care and Mother's mental health. *See* T.C.O. at 7-8.

Mother argues the juvenile court's determination was an abuse of its discretion. Mother explains that the question of dependency turns on whether the Children were *presently* without parental care. According to Mother, the juvenile court's decision was erroneously based on her prior conduct. Mother notes the court's reliance upon her "history of absconding" from treatment programs. *See* Mother's Brief at 20 (citing T.C.O. at 8, 9). In any event, Mother argues that she was presently clean and sober at the time of the adjudicatory hearing. Moreover, Mother maintains that Maternal Aunt could care for the Children.

Mother is correct that the question of dependency turns on the present circumstances – *i.e.*, whether the child is *presently* without parental care and whether such care is immediately available. *See L.V.*, 209 A.3d at 416. (That notwithstanding, "[i]t is well-settled that a finding of dependency can be made on the basis of prognostic evidence and such evidence is sufficient to meet the strict burden of proof necessary to declare a child dependent.") (internal quotation and citations omitted). *See, e.g., In re E.B.*, 83 A.3d 426, 433 (Pa. Super. 2013).

Here, Mother relapsed, resulting in both Mother and K.H. testing positive for illicit substances at the time of K.H.'s birth in January 2024. Significantly, there was clear evidence that her drug abuse had an adverse effect on all four Children. For example, K.H. spent over a month in the NICU with withdrawal

symptoms. The older three Children were neglected. They were severely behind in their medical care, to the point where two of the Children required oral surgery for tooth decay. We recognize that Mother entered Family House Now soon thereafter, and that she has remained sober during the months between January 2024 and the adjudicatory hearing in April 2024. Still, Mother's "history of absconding" is a present concern. As we discuss below, Family House Now would not prevent Mother from leaving in the event she chose to do so.

After review, we conclude the juvenile court's dependency findings were supported by the record. Mother's recent drug use had caused the Children to go without proper parental care. There was sufficient evidence that Mother was not meeting the needs of the Children thereby putting them at risk of harm. ***See L.V., supra***. That Mother alleged Maternal Aunt could care for the Children in her absence does not change the fact that the Children were without ***parental*** care. Notwithstanding her recent sobriety, the court acted within its discretion when it found Mother was unable to resume immediate care of the Children.[1] Mother's first issue merits no relief.

---

[1] Although we conclude the record supports the juvenile court's decision, we note the court's reference to a caseworker's speculation that Mother's treatment would take six to twelve months. Mother argues that such an opinion could have only been made by an expert. Mother did not appeal that issue, and thus the matter is not before us.

However, we are wary of such a timeline insofar as it prohibits reunification. All things being equal, we cannot imagine how reunification could be delayed for up to an entire year, if the parent remains sober.

Mother's second issue corresponds with the second prong of the dependency analysis – *i.e.*, the Children's disposition post-adjudication. Mother argues that even if sufficient evidence existed to adjudicate the Children dependent, the juvenile court abused its discretion when it subsequently removed them from Mother's care.

In *In re D.A.*, *A Minor*, 801 A.2d 614 (Pa. Super. 2002) (*en banc*), this Court explained:

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S.A. § 6351(a).

*Id.* at 617 (citation omitted); *see also In re M.L.*, 757 A.2d 849, 850-51 (Pa. 2000).

However, even after a child has been adjudicated dependent, a court may not separate that child from the parent unless it finds that the separation is clearly necessary. *Interest of N.S.*, 237 A.3d 546, 551 (Pa. Super. 2020) (citing 42 Pa.C.S.A. § 6301(b) (relating to the Juvenile Act's purpose to keeping families together) (mentioned *supra*)). Such necessity is implicated where the welfare of the child demands that they be taken from their parents' custody. *N.S.*, 237 A.3d at 551 (citation omitted). "Clear necessity" is established when the court determines that alternatives are not feasible. *Id.* (citing *A.N. v. A.N.*, 38 A.3d 326 (Pa. Super. 2012)).

- 10 -

On appeal, Mother's argument on this appellate issue dovetails with her argument above. She maintains that DHS's concerns should have been allayed, because she has been sober since enrolling in the in-patient drug treatment program at Family House Now. She contends that this program will provide her with the support she needs to provide proper care. Notably, an employee of Family House Now testified that the facility could permit at least one other sibling to live with Mother and the infant K.H. According to the employee, the facility's staff monitors and checks in on its residents every 30 minutes. Mother also argues that Maternal Aunt would be willing to take any Child or Children that cannot join Mother at the facility.

After review, we conclude the juvenile court did not abuse its discretion when it committed the Children to the legal custody of DHS. The record supports the court's finding that there were no feasible alternatives to removal. While Mother would be able to stay at Family House Now with two or perhaps three of her four Children, the facility would not prevent Mother from leaving and taking the Children with her. Having already determined that the Children are without proper parental care, the juvenile court was not willing to risk their safety by leaving open the possibility that Mother could quit her treatment program prematurely, as she had done in the past, and take her Children with her.

Apart from Mother's drug use, the record supports the court's disposition for another reason. Assuming for argument's sake that Mother only relapsed once, immediately prior to K.H.'s birth January 2024, the same would not

explain the neglect of the older Children. These Children had gone without medical care for some time, to the point where two of the Children required oral surgery. The juvenile court questioned Mother's ability to make proper decisions regarding the Child's welfare. Thus, the court ruled that the Children would also be removed from Mother's legal custody, having determined that there were no feasible alternatives. We discern no abuse of discretion. Mother's second issue merits no relief.

In her final issue, Mother argues the trial court erred when it determined that DHS made "reasonable efforts" to prevent or eliminate the need for the Children's removal. Relevant here, the Juvenile Act provides:

> Prior to entering any order of disposition […] that would remove a dependent child from his home, the court shall enter findings on the record or in the order of court as follows:
>
> (1) that continuation of the child in his home would be contrary to the welfare, safety or health of the child; and
>
> (2) whether reasonable efforts were made prior to the placement of the child to prevent or eliminate the need for removal of the child from his home, if the child has remained in his home pending such disposition; or
>
> (3) if preventive services were not offered due to the necessity for an emergency placement, whether such lack of services was reasonable under the circumstances; or
>
> (4) if the court has previously determined pursuant to section 6332 (relating to informal hearing) that reasonable efforts were not made to prevent the initial removal of the child from his home, whether reasonable efforts are under way to make it possible for the child to return home; and

(5) if the child has a sibling who is subject to removal from his home, whether reasonable efforts were made prior to the placement of the child to place the siblings together or whether such joint placement is contrary to the safety or well-being of the child or sibling.

42 Pa.C.S.A. § 6351(b).

Our Supreme Court has described the purpose behind the reasonable efforts requirement:

[T]he federal government enacted ASFA and related statutes to address the problems of foster care drift and ensure that dependent children are provided permanent homes either through reunification or adoption. To accomplish this goal, the federal government tied federal funding of foster care and adoption assistance to each state's adoption of a plan regarding its foster care system. *See* 42 U.S.C. § 671 (setting forth the requirements of a state plan "[i]n order for a State to be eligible for payments" for foster care and adoption assistance). The federal government required state plans to provide that "reasonable efforts shall be made to preserve and reunify families," absent certain exceptions. *Id.* § 671(a)(15)(B). Section 672 in turn provides, *inter alia*, that a state should "make foster care maintenance payments on behalf of each child" if "reasonable efforts of the type described in Section 671(a)(15) of this title for a child have been made." *Id.* § 672(a)(1), (2)(A)(ii). The federal payments to the states are likewise based upon the Section 672 payments. *Id.* § 674; *see also* 45 C.F.R. 1356.21(b) (detailing that agencies must make reasonable efforts "to effect safe reunification" to be eligible to receive federal foster care maintenance payments).

*In re D.C.D.*, 105 A.3d 662, 675-76 (Pa. 2014).

Neither federal nor Pennsylvania law defines "reasonable efforts." *In Interest of C.K.*, 165 A.3d 935, 941-42 (Pa. Super. 2017). However, our courts have explained that because the focus of the Juvenile Act is on the

dependent child, as opposed to the parents, any services for parents must directly promote the best interests of the child. ***C.K.***, 165 at 942 (citing ***In re J.R.***, 875 A.2d 1111, 1118 (Pa. Super. 2005)). We have also stressed that the agency is not expected to do the impossible and is not a "guarantor of the success of the efforts to help parents assume their parental duties." ***Id.*** (citations omitted).

Here, the juvenile court determined that DHS made reasonable efforts – namely, services relating to parenting, mental health and substance abuse treatment. Instead of accepting these services, however, Mother engaged in other programs, including Family House Now. ***See*** Mother's Brief at 15. Mother alleged that DHS promised one or more Children would remain in her care if she participated in in-patient treatment at Family House Now. Mother also argues that DHS failed to follow through on its referrals for in-home services in any event. ***Id.*** at 35. Still, her main contention is that her participation in the services offered through Family House Now should have eliminated the need for removal; but, if removal was nevertheless necessary, then it follows that the offered services were not "reasonable efforts" as a matter of law. ***See generally id.*** at 34-36.

For its part, DHS maintains its efforts were reasonable, and adds that Mother opted for in-patient treatment at Family House Now instead of engaging with the offered in-home services. Still, DHS argues that removal would have been necessary, notwithstanding the preventative services. Supposing that Mother opted for services in-home, as opposed to in-patient

at Family House Now, DHS explained it still would have had serious safety concerns. DHS points to the home visit in January 2024, which was conducted in January 2024, while K.H. was still in the NICU. At the time, the caseworker said Mother appeared to be under the influence and that she had expressed suicidal ideations. *See* DHS's Brief at 21; *see also* T.C.O., *supra*. Importantly, these concerns could not be alleviated overnight. Mother would have to demonstrate a period of sobriety and stability. In the meantime, DHS had to ensure the Children would not be at risk. Put another way, there would have been no guarantee the offered in-home services would have eliminated the need for the Children's removal. As we noted in *C.K.*, the Agency is not expected to do the impossible, nor is it the guarantor of Mother's success.

Ultimately, Mother opted for in-patient treatment at Family House Now. As we explained above, although these services addressed the Agency's concerns, removal was still necessary. For one, Mother could not take all the Children with her. And, critically, the policies of Family House Now were such that Mother could unilaterally terminate treatment and leave with the Child or Children in her care. Thus, although DHS made reasonable efforts to prevent removal, the same was still necessary. It appears Mother is on the right path; she has engaged in drug and mental health treatment, and she has remained clean and sober. However, just because Mother has followed the recommendations of DHS does not necessarily mean that the need for removal was eliminated or that reunification was immediately warranted. It also does

not mean DHS's efforts were unreasonable; as stated above, DHS cannot be expected to do the impossible. Mother's final issue is without merit.

In sum, we conclude that the juvenile court did not abuse its discretion when it adjudicated the Children dependent and committed them to the legal custody of DHS. We further conclude that, as of the date of the instant order, DHS had made reasonable efforts to reunify the family.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/16/2024