J-A21012-24 & J-A21013-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A., A MINOR | : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: K.A., FATHER | : : : : : : : | |
| | : | No. 1202 EDA 2024 |

Appeal from the Order Entered April 1, 2024
In the Court of Common Pleas of Philadelphia County Family Court at
No(s): CP-51-DP-0000310-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: A.A., A MINOR | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.S., MOTHER | : : : : : : | |
| | : | No. 1182 EDA 2024 |

Appeal from the Order Entered April 1, 2024
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000310-2023,
CP-51-DP-0000310-2023, CP-51-DP-0000310-2023

BEFORE:  KUNSELMAN, J., NICHOLS, J., and BECK, J.

MEMORANDUM BY KUNSELMAN, J.:                    **FILED DECEMBER 05, 2024**

In these consolidated matters, K.A. (Father) and A.S. (Mother) appeal the orders entered by the Juvenile Division of the Philadelphia County Court of Common Pleas, which determined: 1) that they were perpetrators of child abuse under the Child Protective Services Law (CPSL); 2) that their 15-month-

old daughter A.A. (the Child) was dependent under the Juvenile Act and warranted removal; and 3) that there were "aggravated circumstances" associated with the case. *See* 23 Pa.C.S.A. §§ 6302; 6303(b.1); *see also* 42 Pa.C.S.A. § 6302. After careful review, we affirm.

The record discloses the following factual and procedural history. The Philadelphia Department of Human Services (DHS) became aware of the family after receiving a child protective services report in March 2023. At that time, the Child was two months old. The report alleged that Mother and Father took the Child to Children's Hospital of Philadelphia after the Child had decreased movement in her left arm. An examination revealed a fracture in her left humerus (upper arm bone), a bruised upper labial frenulum (the connective tissue between the gums and the lip), multiple healing rib fractures (anterior and posterior), and bilateral tibia fractures (leg bone). There were over twenty fractures. The reporter was concerned that the injuries were the result of non-accidental trauma, since there was no history of trauma that could provide a plausible explanation of the injuries.

A DHS investigator interviewed the parents together. Mother said that a week earlier she had noticed "some blood that came out" after she burped the Child but that there were no impact falls or other traumatic events. Father said the Child's arm got caught when he attempted to swaddle her, and when he unwrapped her, the left arm "appeared to be abnormal," at which point they went to the hospital. As to the rib and leg fractures, Father suggested that he might have swaddled her too firmly or held the child too tightly. Also

- 2 -

as to the leg fractures, Father hypothesized that the injuries could have occurred after he did "bicycles" with the Child's legs too aggressively. The parents reported that they were the sole caregivers, but that Paternal Grandfather also lived in the home. The DHS investigator spoke with a member of the hospital's protective service team, Dr. Zachary Miller, who believed that the injuries were caused by force, were inconsistent with accidental injuries, and could not have been self-inflicted. Further testing failed to show that the Child had poor bone health or a predisposition to fractures.

DHS obtained an order of protective custody, and the juvenile court placed the Child in the home of Paternal Aunt. In April 2023, DHS initiated this action. They requested that the court make the following determinations: 1) that the parents were perpetrators of child abuse under the CPSL; 2) that the Child was dependent under the Juvenile Act; and 3) that aggravated circumstances were present. The juvenile court conducted proceedings over the course of three dates: January 29; March 22; and April 1, 2024.

As a witness for DHS, Dr. Miller testified that, in his opinion, the Child was a victim of abuse. Mother did not present evidence, but Father called Dr. David Vu, also an expert in pediatrics (specifically, pediatric infectious diseases) to refute Dr. Miller's findings. Dr. Vu explained that Mother had

been diagnosed with "a communicable disease"[1] while 30 weeks pregnant with the Child. He testified that, although the Child had been treated for the communicable disease, it was "less likely" that the Child contracted the disease, but if she had contracted the disease, it was "less likely" she would need further treatment.[2] Still, Dr. Vu said that the communicable disease could affect multiple organ systems, as well as bone health. It was Dr. Vu's opinion that, the Child had a predisposition to fractures given the sheer number of them.

Ultimately, the juvenile court concluded that DHS met its burden the parents were perpetrators of child abuse, and that the Child was dependent. Moreover, the juvenile court determined that "aggravated circumstances" existed. Mother and Father appealed. We address the appeals consecutively, beginning with Father. He presents five issues for our review, which we reorder for ease of disposition:

1. Did the juvenile court err by forbidding witnesses and counsel from naming the communicable disease at issue?

2. Did the juvenile court err by finding Father to be a perpetrator of child abuse?

---

[1] The Child Advocate presented a motion seeking to restrict that parties from naming the communicable disease on the record, for the sake of the Child's privacy. The court granted the Child Advocate's motion over Father's objection. Father appealed that ruling.

[2] Although the juvenile court qualified Dr. Vu as an expert in pediatric infectious diseases, the court determined he was not an expert in the impact of the communicable disease vis-à-vis its impact on bone health.

3. Did the juvenile court err by adjudicating the Child dependent?

4. Did the juvenile court err in finding that aggravated circumstances exist?

5. Did the juvenile court err as a matter of law and abuse its discretion by removing the Child from her home?

Father's Brief at 4 (style adjusted).

In his first issue, Father argues the juvenile court erred when it granted the Child Advocate's motion to preclude the parties from mentioning the *name* of the communicable disease that could explain the Child's injuries. To be clear, the specific communicable disease in question was not a mystery. Everyone – the court, the witnesses, the parties, and their counsel – understood which communicable disease they were talking about. Evidentiary rulings are within the sound discretion of the court, which, in this case, granted the Child Advocate's motion to protect the privacy of the Child, even though the juvenile record would already be sealed.

On appeal, Father states that the communicable disease was central to his case. Indeed, it was. As we discuss below, Father argues that because the Child could have contracted the communicable disease *in utero*, a subsequent infection could have predisposed the Child to bone fractures; and if the Child were predisposed to bone fractures, then the Child's injuries were not the result of abuse. Father presented the testimony of an expert, Dr. Vu, to support his theory of the case. Because everyone knew the disease in question, however, Father has not persuaded us that the court's prohibition

on discussing the name on the record was prejudicial to his case. Father's first issue merits no relief.

We turn now to the crux of Father's appeal – namely, whether the juvenile court erred when it determined he was a perpetrator of child abuse, as defined in the CPSL. We note that questions regarding the application of a statute are questions of law, for which our standard of review is *de novo* and our scope of review is plenary. **See Interest of M.M.**, 302 A.3d 189, 196 (Pa. Super. 2023) (citing **Interest of D.R.**, 232 A.3d 547, 554-55 (Pa. 2020)) (further citations omitted).

The CPSL "was created primarily for reporting suspected child abuse, providing the means for doing so, and establishing the persons responsible for reporting the abuse." **M.M.**, 302 A.3d at 196 (citing **Interest of C.B.**, 264 A.3d 761, 771 (Pa. Super. 2021) (*en banc*)); **see also** 23 Pa.C.S.A. § 6301(b). As part of a dependency adjudication, a court may find a parent to be the perpetrator of child abuse as defined by the CPSL. **Interest of S.L.**, 202 A.3d 723, 728 (Pa. Super. 2019).

Under the CPSL, "child abuse" is defined as "intentionally, knowingly, or recklessly doing" one of many acts, including causing "bodily injury" to a child through any recent act or failure to act. **See** 23 Pa.C.S.A. § 6303(b.1) (defining "child abuse"). The CPSL incorporates 18 Pa.C.S.A. § 302(b) to

define "intentionally," "knowingly," and "recklessly."[3]   The CPSL defines

"bodily injury" as "[i]mpairment of physical condition or substantial pain." 23

Pa.C.S.A. § 6303(b.1).

_____

[3] More precisely:

> (1) A person acts intentionally with respect to a material element of an offense when:
>
>> (i) if the element involves the nature of his conduct or a result thereof, it is his conscious object to engage in conduct of that nature or to cause such a result; and
>>
>> (ii) if the element involves the attendant circumstances, he is aware of the existence of such circumstances or he believes or hopes that they exist.
>
> (2) A person acts knowingly with respect to a material element of an offense when:
>
>> (i) if the element involves the nature of his conduct or the attendant circumstances, he is aware that his conduct is of that nature or that such circumstances exist; and
>>
>> (ii) if the element involves a result of his conduct, he is aware that it is practically certain that his conduct will cause such a result.
>
> (3) A person acts recklessly with respect to a material element of an offense when he consciously disregards a substantial and unjustifiable risk that the material element exists or will result from his conduct. The risk must be of such a nature and degree that, considering the nature and intent of the actor's conduct and the circumstances known to him, its disregard involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation.

18 Pa.C.S.A. § 302(b).

The trier-of-fact may render a finding of child abuse upon a showing of "clear and convincing evidence," which is defined as evidence that is so clear, direct, weighty, and convincing as to enable the trier-of-fact to come to a clear conviction, without hesitance, or the truth of the precise facts in issue. *See Interest of L.V.*, 209 A.3d 399, 417 (Pa. Super. 2019); *see also In the Interest of C.S.*, 761 A.2d 1197, 1201 (Pa. Super. 2000) (*en banc*).

Notably, the Legislature carved out a very limited exception to these more stringent evidentiary standards, allowing for the possibility of identifying the perpetrator of abuse based on *prima facie* evidence in certain cases. *In re L.Z.*, 111 A.3d 1164, 1184-85 (Pa. 2015).

The CPSL defines "prima facie evidence of abuse" as:

> Evidence that a child has suffered child abuse of such a nature as would ordinarily not be sustained or exist except by reason of the acts or omissions of the parent or other parent responsible for the welfare of the child.

23 Pa.C.S.A. § 6381(d).

The Supreme Court defined "*prima facie* evidence" as "[s]uch evidence as, in the judgment of the law, is sufficient to establish a given fact, or the group or chain of facts constituting the party's claim or defense, and which if not rebutted or contradicted will remain sufficient." *L.Z.*, 111 A.3d at 1185 (quoting *Black's Law Dictionary* 825 (6th ed. abridged 1991)).

We have explained that "*prima facie* evidence is not the standard that establishes the child has been abused, which must be established by clear and convincing evidence; it is the standard by which the court determines who the

abuser would be in a given case." *C.B.*, 264 A.3d at 771 (citation omitted); *see also L.Z.*, 111 A.3d at 1174. "The Legislature has determined that the likelihood clearly established abuse has occurred, other than at the hands of the custodian, is so small that *prima facie* evidence the custodian has caused the injury, either by acts or omissions, is all that is required." *C.B.*, 264 A.3d at 771.

For example, a parent may rebut the *prima facie* presumption with evidence:

> [d]emonstrating that the parent or responsible person did not inflict the abuse, potentially by testifying that they gave responsibility for the child to another person about whom they had no reason to fear or perhaps that the injuries were accidental rather than abusive. The evaluation of the validity of the presumption would then rest with the trial court evaluating the credibility of the *prima facie* evidence presented by ... [DHS] ... and the rebuttal of the parent or responsible person.

*L.Z.*, 111 A.3d at 1185.

In the instant case, Father argues the juvenile court misapplied the statutory presumption set forth in Section 6381(d). For support, he cites our Supreme Court's decision in *Interest of N.B.-A.*, 224 A.3d 661 (Pa. 2020), as well as Justice Wecht's Concurring Opinion. *See N.B.-A.*, 224 A.3d at 677-80 (J. Wecht – Concurring).

In *N.B.-A.*, a six-year-old girl was sexually abused by her stepbrother. DHS sought to establish the mother as a perpetrator of abuse by omission – *i.e.*, for her failure to protect the daughter. The Supreme Court held that the

- 9 -

presumption did not apply. The Supreme Court noted that there was no evidence the mother knew or should have known that her daughter was being abused, sexually or otherwise. The Court reasoned that although the "sexual abuse of a child may occur when the child is without proper parental supervision, it may also occur ***despite*** a parent's best efforts to care for and supervise a child." ***N.B.-A.,*** 224 A.3d at 675 (emphasis original). The statutory presumption under Section 6381(d) did not apply, because the daughter's abuse was not "of such a nature as would ordinarily not be sustained or exist by reason of the acts or omissions of the parent." ***N.B.-A.*** at 674 (Majority Opinion).

In his Concurrence, Justice Wecht explained that Section 6381(d) contains three requirements: 1) it applies to parents (or other persons responsible); 2) the child must have suffered abuse as defined in Section 6303(b.1); and 3) the abuse is "of such a nature as would ordinarily not be sustained or exist by reason of the acts or omissions" of the parent. ***N.B.-A.***, 224 A.3d at 679 (J. Wecht – Concurring) (citing 23 Pa.C.S.A. § 6381(d)). As to the third element, Justice Wecht stated:

> The language [of Section 6381(d)] indicates that the presumption applies whenever there are injuries that generally would not occur if the parent had been protective and not abusive. It suggests direct causation: that the abuse is of such a nature that it would not exist ***but for*** the parent's acts or omissions.

***N.B.-A.***, 224 A.3d at 679 (J. Wecht – Concurring) (emphasis added).

Citing the above, Father concedes the first prong of the Section 6381(d) analysis; he is a parent, and thus the presumption applies to him. However, he challenges the applicability of the second and third prongs. He argues that the Child's injuries were not, by statutory definition, "child abuse." Alternatively, he claims the abuse was not "of such a nature as would ordinarily not be sustained or exist by reason of the acts or omissions of the parent." **See** Father's Brief at 27-28. We address these arguments in turn.

As mentioned above, the second prong of the statutory presumption requires a threshold finding that the sustained injuries met the definition of child abuse, as defined by the CPSL.[4] Only then does the law inquire whether the injuries were "of such a nature" that they would not have occurred but for the acts or omissions of the parent. Relevant here, the definition of child abuse has a scienter requirement – that is, CPSL defines child abuse as knowingly, intentionally, or recklessly causing bodily injury. **See** 23 Pa.C.S.A. § 6303(b.1).

Relying on Dr. Vu's testimony, Father argues that the Child's fractures were the result of her poor bone health, which in turn was the result of the Child's exposure to the communicable disease while *in utero*. According to Father, if the Child was predisposed to fractures, then whatever the direct cause of the fractures – whether it was his swaddling of the Child or playing "bicycle legs" – Father could not have acted with the requisite state of mind.

_____

[4] The criterion constitutes the second prong of the Section 6381(d) analysis, as described by Justice Wecht.

His infliction of the injuries could not have been done intentionally, knowingly, or recklessly, because he was unaware of the Child's fragile predisposition. Thus, the Child's injuries were not "child abuse." And if that were the case, then the statutory presumption under Section 6381(d) would not apply.

Father's argument, though facially sound, does not survive scrutiny. For one, the Child's blood tests revealed no deficiencies that would lead the hospital to believe that she had poor bone health. The Child was tested for osteogenesis imperfecta, a condition which can predispose a child to fractures; the Child did not carry the genes for that condition. *See* N.T., 1/29/24, at 34; 44-45; 68. The Child's bone formation and growth also appeared normal on radiology scans. *Id.* at 67-69; 118-119.

Moreover, as the juvenile court was quick to note, it was Dr. Vu's own opinion that the Child should be categorized as a "CDC Scenario Three," meaning either the Child never actually contracted the communicable disease, or if she did, the Child was appropriately treated to eliminate the infection. *See* N.T., 3/22/24, at 112-113; N.T., 4/1/24, at 68. Dr. Miller testified that, although it was impossible to rule out an association between the communicable disease and the poor bone health, he could conclude with a reasonable degree of medical certainty that the communicable disease was not a plausible explanation for the totality of the Child's injuries. *See* N.T., 1/29/24 at 116. All told, we conclude the juvenile court did not err when it determined DHS proved by clear and convincing evidence that the Child's injuries constituted child abuse.

Turning to the third prong of the Section 6381(d) analysis, the question becomes whether the child abuse was "of such a nature as would ordinarily not be sustained or exist by reason of the acts or omissions." On this prong, we are guided by our precedents **C.B.** and **N.B.-A.**, **supra.** In **C.B.**, medical testimony established that a five-month-old infant suffered injuries (a broken right arm and right shoulder fractures) that were the result of non-accidental trauma. The lower court applied the statutory presumption and determined that the parents were perpetrators of abuse. On appeal, we specifically distinguished the facts from **N.B.-A.** with the facts from **C.B. See C.B.**, 264 A.3d at 771.

For instance, we noted that the mother in **N.B.-A.** had no reason to suspect that her daughter was being abused by the stepbrother, especially since the daughter denied the abuse.[5] By contrast, the infant in **C.B.** was incapable of describing or denying the abuse. **See C.B.**, 264 A.3d at 774. "The most notable distinction, however, [was the doctor's] determination that [the child's] fractures were non-accidental and 'most likely the result of inflicted trauma.' In his expert opinion, [the child's] injuries were inflicted intentionally and caused by force being applied to [the] arm in a 'yanking-

_____

[5] There, the mother had taken her daughter to the hospital after the daughter experienced vaginal irritation. Ultimately, the hospital discovered that the cause was a sexually transmitted infection. Upon testing members of the household, it was discovered that the mother, the stepbrother, and the daughter all had the infection.

type' motion – injuries that would have caused him substantial or severe pain." *Id.*

The Supreme Court ruled that the sexual abuse in *N.B.-A.* was not "of such a nature as would ordinarily not be sustained or exist by reason of the acts or omissions." According to the Court, that sort of sexual abuse could have occurred despite a parent's best efforts to protect the child. In *C.B.*, by contrast, an *en banc* panel of our Court explained that an infant's non-accidental injuries could not have occurred but for acts or omissions of the parents.

Here, evidence of the Child's abuse was akin to the evidence in *C.B.* and distinguishable from the sexual abuse in *N.B.-A.* The subject Child suffered over twenty factures, to say nothing of the bruised frenulum. DHS presented evidence, in the form of Dr. Miller's expert testimony, that the Child's injuries were neither accidental nor self-inflicted. *See* N.T., 3/22/24 at 36, 37, 54-55. It was Dr. Miller's opinion that the infant could not generate enough force to cause the injuries on her own. *Id.* Thus, like the injuries in *C.B.*, we conclude that the Child's injuries *were* "of such a nature as would ordinarily not be sustained or exist by reason of the acts of omissions." In short, we conclude the juvenile court's application of the Section 6381(d) presumption was proper. Father's second issue is without merit.

Next, Father argues the juvenile court erred when it adjudicated the Child dependent. To adjudicate a child dependent, the court must determine, by clear and convincing evidence, that the child:

is without proper parental care or control, subsistence, education as required by law, or other care or control necessary for his physical, mental, or emotional health, or morals. A determination that there is a lack of proper parental care or control may be based upon evidence of conduct by the parent, guardian or other custodian that places the health, safety or welfare of the child at risk.

42 Pa.C.S.A. § 6302.

In accordance with the overarching purpose of the Juvenile Act "[t]o preserve the unity of the family wherever possible," *see* 42 Pa.C.S.A. §6301(b)(1), "a child will only be declared dependent when he is presently without proper parental care and when such care is not immediately available. *L.V.*, 209 A.3d at 416 (internal citations omitted). The Court has defined "proper parental care" as "that care which (1) is geared to the particularized needs of the child and (2) at a minimum, is likely to prevent serious injury to the child." *Id.*

The standard of review in dependency cases requires an appellate court to accept the findings of fact and credibility determinations of the juvenile court if they are supported by the record; but it does not require the appellate court to accept the juvenile court's inferences or conclusions of law. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010).

Father's argument on this issue relies on the success of his argument above. Assuming we agreed the Child's injuries did not constitute child abuse, and that Father was not a perpetrator of that abuse, then it would follow that the Child was not without proper parental care. *See* Father's Brief at 44. Of course, we do not agree with Father's above claims, and thus we accept the

juvenile court's finding that Child suffered child abuse and that Father was a perpetrator of that abuse. Father presents no other argument as to why the Child's dependency adjudication was erroneous or an abuse of discretion. As such, we conclude Father's third issue merits no relief.

Father's fourth issue pertains to the juvenile court's finding that "aggravated circumstances" exist in this case. The Juvenile Act provides that a dependency petition may allege that there are "aggravated circumstances" relating to an allegedly dependent child. *See Interest of J.M.*, 166 A.3d 408, 418 (Pa. Super. 2017). Relevant here, the Juvenile Act defines aggravated circumstances as, *inter alia*:

> Section 6302 defines aggravated circumstances as:
>
> (2) The child or another child of the parent has been the victim of physical abuse resulting in serious bodily injury, sexual violence or aggravated physical neglect by the parent.

42 Pa.C.S.A. § 6302.

"Aggravated physical neglect" is further defined as: "Any omission in the care of a child which results in a life-threatening condition or seriously impairs the child's functioning." *Id.*

The Juvenile Act provides:

> If the county agency or the child's attorney alleges the existence of aggravated circumstances and the court determines that the child is dependent, the court shall also determine if aggravated circumstances exist. If the court finds from clear and convincing evidence that aggravated circumstances exist, the court shall determine whether or not reasonable efforts to prevent or eliminate the need for

> removing the child from the home or to preserve and reunify the family shall be made or continue to be made and schedule a hearing [...].

42 Pa.C.S.A. § 6341(c.1)

Instantly, the juvenile court found aggravated circumstances existed. As with Father's dependency argument, his contention here is predicated on the assumption that the Child was not a victim of abuse and that he was not a perpetrator of abuse. Again, we accept the juvenile court's finding of abuse; and as such, we conclude the court's finding of aggravated circumstances was proper. Father's fourth issue merits no relief.

Father's final issue pertains to the disposition of the Child following the adjudication. This Court explained:

> If the court finds that the child is dependent, then the court may make an appropriate disposition of the child to protect the child's physical, mental and moral welfare, including allowing the child to remain with the parents subject to supervision, transferring temporary legal custody to a relative or a private or public agency, or transferring custody to the juvenile court of another state. 42 Pa.C.S.A. § 6351(a).

*In re D.A.*, *A Minor*, 801 A.2d 614, 617 (Pa. Super. 2002) (*en banc*) (citation omitted); *see also In re M.L.*, 757 A.2d 849, 850-51 (Pa. 2000).

However, even after a child has been adjudicated dependent, a court may not separate that child from the parent unless it finds that the separation is clearly necessary. *Interest of N.S.*, 237 A.3d 546, 551 (Pa. Super. 2020) (citing 42 Pa.C.S.A. § 6301(b) (relating to the Juvenile Act's purpose to keeping families together) (mentioned *supra*)). Such necessity is implicated

- 17 -

where the welfare of the child demands that they be taken from their parents' custody. *N.S.*, 237 A.3d at 551 (citation omitted). "Clear necessity" is established when the court determines that alternatives are not feasible. *Id.* (citing *A.N. v. A.N.*, 38 A.3d 326 (Pa. Super. 2012)).

Father argues that the juvenile court erred when it found that DHS established "clear necessity" that the Child should be removed from the parents' care. Father reasons that at the time of the disposition, in April 2024, the Child had already been temporarily committed to DHS's custody for over a year. Father argues that he has faithfully completed all that was asked of him. He notes that the CUA case aide testified that the supervised visits go well, that Father's demeanor is loving and that he is attentive to the Child's needs. Still, the CUA caseworker was unwilling to recommend unsupervised visits. *See* Father's Brief at 46-47.

The Child Advocate's Brief, which DHS largely joined, is wholly silent as to Father's disposition claim. The juvenile court opinion, which satisfies its obligations under Pa.R.A.P. 1925(a) by directing us to the notes of testimony, offers little more. We note, however, that the juvenile court has not relieved DHS of its obligation to make reasonable efforts toward reunification. *See* N.T., 4/1/24, at 73.[6] Given this, it appears the parents could be on track to receive increased visitation because they have adhered to the reunification plan. However, that is not the issue before us.

_____

[6] The court also observed that it was the position of the Child Advocate that DHS should still be required to make reasonable efforts.

- 18 -

The issue here is whether the Child's removal remained a clear necessity in April 2024. Given the Child's injuries, the juvenile court determined there were no feasible alternatives to removal. We discern no abuse of discretion. It bears noting, however, that the juvenile court has recognized the parents' participation thus far. At the end of the proceedings, the court ordered counseling, addressed the possibility of a less restrictive form of supervised visitation, and set the matter for a permanency review sooner than the 90 days suggested as best practice (and well before the six months required by law). *See id.* at 75-80. In sum, Father's final issue merits no relief.

Having disposed of Father's issues, we turn next to Mother's appeal. She presents the virtually the same claims for our review:

1. Whether the juvenile court erred in finding Mother to be a perpetrator of child abuse?

2. Whether the juvenile court erred by adjudicating the Child dependent?

3. Whether the juvenile court erred in transferring custody of the Child to DHS when it did not meet its burden by clear and convincing evidence?

4. Whether the juvenile court erred when it made a finding of aggravating circumstances against parents?

5. Whether the errors committed by the juvenile court deprived Mother of her rights to due process and equal protection under the law?

Mother's Brief at 4.

We address Mother's appeal separately due the deficiencies in her Brief. We note that Mother submitted her Brief late, after this Court issued an order

inquiring whether Counsel abandoned her client. Therein, Counsel presents a *singular* argument to address all five issues, in circumvention of Pa.R.A.P. 2119(a) which requires the argument to be divided into as many parts as there are question to be argued. In the singular argument, Counsel only addresses the finding of child abuse under the CPSL, and nominally, the finding of aggravated circumstances. She does not mention the adjudication of dependency, the Child's disposition, or Mother's constitutional claim. *See generally* Mother's Brief at 8-10.

The only reason we could conduct a meaningful review is because Father's appeal comprises the same four substantive issues: the finding of child abuse; the finding of dependency; the Child's disposition; and the finding of aggravated circumstances.[7] These claims overlap completely. The statutory presumption under 23 Pa.C.S.A. § 6381(d) applies to both parents equally; indeed, the presumption exists to identify the perpetrator. It is of no moment whether one parent was the perpetrator by omission and the other was the perpetrator by action, or for that matter, whether both parents were active or passive perpetrators. The result is the same. The finding that the

_____

[7] The parents' appeals differ in one regard – Father's "communicable disease" claim and Mother's constitutional claim.

As for Mother's constitutional claim, we might generously assume Counsel made the conscious decision to abandon it. After all, such a claim could be considered duplicative. Assuming the juvenile court erred when it adjudicated the Child dependent, for instance, such an error necessarily would have meant that Mother's substantive right to due process (namely, her right to the care, custody, and control of the Child) was infringed. But because we discern no error, we likewise would discern no constitutional violation.

Child was abused, and that the parents were perpetrators, was the foundation for the Child's subsequent adjudication and disposition. Thus, to review Father's claims is to review Mother's claims. To the extent Mother provides separate arguments on the finding of abuse, we find those arguments unavailing.

To conclude, we discern no error of law or abuse of discretion upon review of the juvenile court's determination that Mother and Father were perpetrators of abuse under the CPSL, that the Child was dependent; that the Child should be removed from their care; and that the case presented aggravated circumstances. Father's claim relating to the "communicable disease" is meritless. Mother waived her constitutional claim.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/5/2024